[No. S148949. July 28, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
TONY LEE ALLEN, Defendant and Appellant.

846

COUNSEL

Christopher Blake, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Jeffrey J. Koch and Gary W. Schons, Assistant Attorneys General, Brad Weinreb and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GEORGE, C. J.—Defendant Tony Lee Allen committed two forcible rapes in 1990. (Pen. Code, § 261, subd. (a)(2).) He pleaded guilty to those offenses and was sentenced to 20 years in state prison. Upon his release from prison in 2001, he was committed to Atascadero State Hospital (Atascadero) under the Sexually Violent Predator Act. (Welf. & Inst. Code, § 6600 et seq. (SVPA or Act).)[1] This case arises from a proceeding to extend defendant's commitment as a sexually violent predator. At the trial by jury in the underlying proceeding, defendant personally asserted a right and a desire to testify, but his counsel advised the court that for tactical reasons counsel was opposed to defendant's testifying. After informing defendant that counsel controlled this decision, the court agreed it would not be in defendant's interest to testify. For this reason, defendant did not testify. After the jury reached a verdict, the court extended his commitment.

We granted defendant's petition for review to address the issue whether a defendant in a sexually violent predator proceeding has a state or federal constitutional right to testify over the objection of his or her counsel.[2] We conclude that a defendant in such a proceeding has a right under the California and the federal Constitutions to testify despite counsel's decision that he or she should not testify. We further conclude that the denial of the right to testify is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).

---

[1] All further statutory references are to this code unless otherwise specified.

[2] The parties have not identified and this court has not located an opinion in this state or any other state addressing this precise issue. Although a Washington state court held that a sexually violent predator has a right to testify over the objection of counsel, its holding was based upon Washington's statutory scheme governing the confinement of sexually violent predators, which provides that defendants in such proceedings have all of the constitutional rights available to defendants in criminal actions. (*Detention of Haga* (1997) 87 Wn.App. 937 [943 P.2d 395, 396–397], disapproved on other grounds in *State v. Robinson* (1999) 138 Wn.2d 753 [982 P.2d 590, 599].)

Finally, we conclude that the trial court's error in refusing to allow defendant to testify was harmless.

## I.

On November 29, 2004, the San Bernardino County District Attorney's Office filed a petition to extend defendant's commitment under the Act. On January 5, 2005, the trial court held a hearing to determine whether there existed probable cause to believe defendant was likely to engage in sexually violent predatory criminal behavior absent appropriate treatment and custody. On January 28, 2005, the trial court found probable cause and set the petition to extend defendant's commitment under the SVPA for a jury trial. (§ 6602.) Trial was held in August 2005, but the jury was unable to reach a verdict, and the trial court declared a mistrial.[3] Following retrial in November 2005, the jury found true the allegation that defendant met the criteria of a sexually violent predator under sections 6600 through 6604, and the court ordered defendant committed to a state mental hospital for two years of confinement. (Former § 6604.)[4]

At trial, the People presented testimony of Drs. Robert Owen and Shoba Sreenivasan, psychologists retained by the State Department of Mental Health to evaluate defendant. The People also presented testimony of Dr. Jackson Rowland, a psychiatrist employed at Atascadero. Defendant presented no evidence.

Dr. Robert Owen testified that he reviewed police reports and court documents from the cases in which defendant pleaded guilty to rape, documents from the Department of Corrections and from Atascadero, and other medical and psychiatric records and reports concerning defendant.[5] Subsequently, in October 2004, Owen met with defendant at Atascadero and interviewed him for approximately one and one-half hours about his life, including his sexual history. Owen also interviewed Michael Pritchard, a psychologist who was treating defendant at Atascadero.

---

[3] Defendant did not testify at the first trial on the petition to extend his commitment.

[4] The SVPA was amended in various respects by Proposition 83, the Sexual Predator Punishment and Control Act: Jessica's Law (hereinafter, Proposition 83), which was approved by the voters at the General Election in November 2006. Among the changes made by this enactment was an amendment to section 6604 providing a commitment for an indeterminate term rather than for two years.

[5] The court admonished the jury that the information obtained by an expert from documents prepared by others was admissible to explain the basis of the expert's opinions, but was not evidence of the truth of the information. The documents upon which the experts relied were not admitted into evidence.

Owen began by describing the two rapes of which defendant was convicted. In January 1990, defendant entered Sandra C.'s vehicle as she stopped in the parking lot of a small store to buy a soda. He asked for a ride, and she told him to leave. He demanded that she drive him "somewhere." After she did so, he directed her to stop the vehicle in an alleyway. He then pulled wires out of her ignition, disabling her vehicle. He unscrewed the lock on her side of the car and locked the doors, smoked cocaine and drank wine and forced her to do the same, grabbed her by the hair, held a screwdriver to her throat, hit her with the wine bottle, and sexually assaulted her. As he tried to reconnect the ignition wires, she escaped from the car and was assisted by a passing driver in contacting the police.

Approximately two weeks later, defendant entered Lisa L.'s automobile while she was waiting in the vehicle for a friend. Defendant wrapped his hands around Lisa's neck and dragged her out of her vehicle and to a dark area. She resisted, but noticed that he had a hammer. He raped and sodomized her. In the course of sexually assaulting her, defendant became angry and hit her in the face and arms with his fist. After sexually assaulting her, he smoked cocaine and blew smoke in her face and vagina.

Owen testified that these two offenses were predatory in nature because both victims were strangers to defendant, and opined that any future offenses also would be predatory. Owen explained that in evaluating whether a person's behavior reflects a sexual disorder, he focuses upon any pattern reflected in the behavior. In support of his opinion that defendant suffers from a sexual disorder, Owen testified concerning three incidents that occurred prior to the commission of the rapes of Sandra C. and Lisa L. but that did not lead to convictions.

In July 1989, defendant asked for a ride from Rhonda A., a woman he knew. She gave him a ride to one location, but then declined to drive him to another location. He became angry, grabbed her by the hair, pulled out a knife, forced her to the passenger side of the vehicle, and drove to various locations, smoking cocaine and speaking with persons where he stopped. At one home where they stopped, the occupants of the residence encouraged defendant to return the vehicle to Rhonda, but he refused. Rhonda reported the incident to the police.[6]

---

[6] Owen testified that, although the incident did not involve sexual misconduct, it reflected defendant's use of force, violence, and a weapon, as well as his disregard for others. Owen viewed this incident as evidence tending to establish that defendant is a psychopath, and testified that a psychopath who suffers from paraphilia is likely to reoffend.

The next day, he smoked cocaine with Tambria R., a woman he encountered at a friend's apartment. Defendant then removed his clothing and asked Tambria to have sex with him. She was frightened by him and agreed to have sexual relations to avoid being raped. Later the same day, he returned with more cocaine, and when Tambria refused to have sex with him, he slapped her face, threatened her with a bottle, and raped and sodomized her for more than an hour. When defendant went to the restroom, Tambria escaped to a neighbor's apartment. The neighbor informed the police that Tambria was hysterical as she reported the assault, and that Tambria told the neighbor to call the police because the assailant had a beer bottle and was coming after her.

In September 1989, defendant approached Melanie H., 17 years of age, outside a grocery store where she had arrived at approximately 6:00 p.m. to buy food for her grandmother. Defendant asked Melanie to drink wine with him. When she declined, he grabbed her by the throat, forced her to drink some wine, and took her behind the store, where he ripped off her clothes and raped her on cement steps in a loading zone. Some children walked by while the rape was occurring, and Melanie motioned to them to get help. After raping Melanie, defendant wrote his telephone number on a piece of paper, gave it to her, and told her to call him and meet him the next day or he would kill her. Melanie reported the attack to the police. Owen testified that these assaults were predatory and violent and demonstrated a lack of volitional and emotional control.

Owen further testified that while defendant was in prison, he stalked female prison guards, attempted to be alone with them, made sexual statements to them, wrote a note to one proposing a personal relationship, stared at a female guard while standing in front of his cell door with the lights on and his erect penis protruding from his boxer shorts, and stared at another female guard while masturbating. This conduct led to defendant's repeated segregation in prison, but discipline did not deter him from continuing to engage in inappropriate sexual conduct toward female prison staff. Defendant also violated other prison rules by refusing to enter his cell, defacing property with gang graffiti, fighting with cellmates, stealing, and refusing to report for work.

After defendant was committed to Atascadero in 2001, he sexually harassed female staff members, stared at them for minutes at a time, attempted to move close to them, touched one on the leg, exposed his penis, and wrote sexual notes to staff, some of which were delivered by other patients whom defendant intimidated. Defendant's inappropriate behavior was reported to his

parole officer within days after defendant arrived at Atascadero; his parole was revoked, and he was sentenced to an additional year in custody. While serving his sentence in 2002, defendant continued to defy authority and, in one incident, grabbed the arm of a female officer in the county jail and told her, "You know what I want."

Defendant continued to engage in inappropriate sexual behavior after he returned to Atascadero from county jail. He stared at female staff members and approached them. He told a staff member he would see her again outside of Atascadero. He loitered at the door of a female social worker whom he had been stalking, despite having been told he was not allowed to be near the social worker except in a class setting. He stared into her office window intently, said he wanted to speak to the social worker, and declined to leave. According to Owen, defendant "had to be within line of sight of staff because he was stalking so many women at the hospital." Owen viewed this conduct as evidence tending to establish that defendant cannot control his sexual drive.

Owen also noted defendant's long criminal record. When he was a juvenile, defendant was arrested for illegal possession of weapons and placed on probation. In 1985, at 18 years of age, defendant was found in possession of cocaine in a house in which weapons were found. His crimes from 1986 through 1988 included trespass, burglary, grand theft, robbery, possession of drugs, and resisting a peace officer. As noted above, the uncharged conduct against Rhonda A., Tambria R., and Melanie H. occurred in 1989, and the predicate offenses occurred in 1990, after which time he has been continuously in prison, county jail, or Atascadero.

Based upon defendant's long criminal history, deceitfulness, violent conduct, reckless behavior toward others, lack of remorse, and lack of empathy, Owen concluded that defendant's mental disorders include paraphilia (specifically, an urge for sex with nonconsenting adults), antisocial personality disorder, psychosis, and cocaine dependency. To assess the likelihood that defendant will reoffend, Owen reviewed risk factors that are considered in making an assessment on the "Static-99" scale, which predicts the likelihood that an individual will reoffend. Based upon various risk factors, such as his age (37 years of age at the time of trial), history, behavior, and lifestyle, defendant's score on the Static-99 scale was an eight. Men with similar scores have a 39 percent probability of being convicted of a new sexual offense within five years of returning to the community, a 45 percent probability of such a conviction within 10 years, and a 52 percent probability of such a conviction within 15 years. Owen explained that these figures

underestimate the probability that an individual will commit another sexual crime, because the figures relate only to *convictions* for new sexual offenses and do not include conduct that does not lead to an arrest and conviction. Owen also testified that defendant was in the second phase of a five-phase sex offender treatment program at Atascadero, but he explained that defendant's treatment had not really begun, because defendant continued to deny committing any sexual offenses. Owen concluded defendant is in a high-risk category for reoffending.

Owen confirmed that defendant earned his high school graduate equivalency degree and also participated in classes concerning human sexuality and medications and their side effects. Defendant participated in Alcoholics Anonymous, Narcotics Anonymous, anger management, and interpersonal skills groups. He attended popcorn socials and bingo games, and exercised in the gym. Defendant expressed concern regarding his mother, and spoke of his brother and his son.

Dr. Shoba Sreenivasan also reviewed background documents and interviewed defendant. She explained that her diagnosis of defendant was based upon behavior over his lifetime, and provided additional details concerning that behavior. She testified that defendant had reported to her that when he was 13 years of age, he and three other boys of similar age had engaged in sexual relations with a girl who was 13 years of age. Defendant had rejected Sreenivasan's suggestion that the incident was a gang rape, and instead seemed to perceive that "this thirteen-year-old girl really wanted to have sex with all four of these boys." Sreenivasan noted that law enforcement records reflect—in addition to defendant's lengthy criminal history and wide range of criminal behavior—that defendant had used seven or eight aliases, which demonstrated a pattern of being untruthful. She observed that when defendant was confined at Atascadero before his parole was revoked, he received eight "behavioral notes" in a six-day period instructing him to cease engaging in various behavior. She concluded from his behavior that he had "no boundaries" and respected no one. When defendant returned to Atascadero in 2003, he participated in a treatment program, but his participation did not diminish his inappropriate behavior. For example, immediately after concluding a group session, he left the room and began stalking a female social worker. When defendant was told to stop circling female staff in an outdoor courtyard where the staff took their breaks, he laughed and continued the behavior at a further distance. He also was observed staring at a female student while he had a visible erection, and was seen in a public area with a visible erection. In Sreenivasan's opinion, defendant was "just showing up at treatment" and was not making progress in addressing his sexual deviancy.

Sreenivasan diagnosed defendant with untreated paraphilia, a personality disorder, and cocaine dependence. She stated that his Static-99 score of eight is very high; individuals with a score of six or higher are in the highest risk group. She agreed with the probabilities of reconviction as noted by Owen, and added that research data concerning high-risk offenders released from California prisons in 1989 and 1990 reflect that 90 percent of those with a score of six on the Static-99 scale committed another sexual offense within 14 years, and all of those with a score of seven or higher committed another sexual offense within that period. Sreenivasan also testified that approximately two-thirds of sexual assaults are not reported to the police, and that approximately 60 percent of the reported assaults are not solved. Therefore, the probabilities reflected in the Static-99 evaluation underestimate the risk that an individual will reoffend. She confirmed on cross-examination that originally she had given defendant a score of six on the Static-99 scale, which is the low end of the high range, but explained that she arrived at a score of eight after she received more information concerning his criminal history.

Dr. Jackson Rowland treated defendant when he was admitted to Atascadero in 2001, and again beginning in 2003 when defendant returned to Atascadero, until he was transferred to county jail in December 2004 for the underlying proceeding to extend his commitment. Rowland testified concerning defendant's inappropriate behavior toward female staff at Atascadero, such as writing "love letters" to staff, stalking staff, and exposing himself. Rowland stated that defendant suffers from paraphilia, and also seems to have erotomanic delusions, signifying that he believes women are in love with him. According to Rowland, female employees complained about defendant's inappropriate behavior "[a]ll the time." When staff confronted defendant concerning instances of inappropriate behavior, he would deny that such behavior occurred.

Rowland testified that in addition to defendant's paraphilia and delusions, defendant suffers from a psychotic disorder, which is characterized by disorganized and confused thinking. For example, when defendant arrived at Atascadero, he was unable to perform the minimal tasks required by Atascadero "Patient Access System" in order to be allowed to visit areas of the hospital outside of his unit. To travel to another location in the hospital, such as the library, a patient must write his or her destination, and the time of the visit, on two "hall cards." Defendant required several weeks to prepare such cards successfully and to travel to the identified destination; on numerous occasions, he failed to complete the hall cards, or he prepared them incorrectly, or he would be found someplace other than the destination specified on his card.

Rowland recommended to defendant that he take medication for his psychotic disorder. Despite hours spent by Rowland as well as a staff psychologist, the supervisor of defendant's unit, and a social worker, explaining to defendant the necessity of medication, he declined to take medication because he did not believe he had a psychotic disorder. Defendant eventually agreed to take a lower dose of the medication than recommended, if he was rewarded with a peanut butter and jelly sandwich at night. While on medication, defendant's behavior improved sufficiently to elevate him to level three of the Patient Access System, which allowed him to prepare a hall card and travel outside his unit to another location in the hospital. When defendant was not taking medication, he was on level one of the Patient Access System, and therefore was confined to his unit within the hospital.

After several months of taking the first medication prescribed, defendant discontinued its use when he learned that diabetes is a potential side effect, despite defendant's lack of any diabetic symptoms. Some weeks later, he agreed to take a low dose—less than half of the therapeutic dose—of a different medication, and he took it "on and off" while at Atascadero but complained of its sedative effect. Rowland explained to defendant that he would experience side effects at first, but those would dissipate "and then the good [e]ffects would come into play," but according to Rowland, defendant "never received an adequate trial" of either medication. Rowland testified defendant's medical records reflect that after his transfer to county jail for the present proceedings, defendant was asked numerous times to take medication but refused, stating he did not need to take medication because there was nothing wrong with him.

Rowland described the five phases of treatment provided at Atascadero. Phase one is an "informational phase," during which the staff helps a patient understand the program, and the patient decides whether to accept treatment. If the patient accepts treatment, he or she enters phase two, during which the patient learns about his or her "cognitive distortions," which Rowland described as the distorted thought processes that allow the patient to rationalize, justify, and engage in inappropriate behaviors. In phase three, the patient applies what he or she has learned in phase two to the patient's current behavior, with the goal of interacting more appropriately with staff and other patients. When appropriate behavior is achieved, the patient enters phase four, which involves preparation for entering the community. Finally, in phase five, the patient is released from the hospital and resides in the community, but remains supervised. Rowland testified that defendant is in phase two of the treatment program, and "if he's released today, he'd be as he was when he entered the facility. There's been no substantial progress . . . in any regard."

During the trial, defendant's counsel stated his intention not to call any witnesses on defendant's behalf, but informed the court that defendant desired to testify and that counsel desired that defendant not testify. The court expressed the view that, because an SVPA proceeding is not a criminal proceeding, counsel had authority to decide whether his client would testify.

When the court inquired as to the subject matter upon which defendant wished to testify, counsel identified three topics. First, defendant would address the issue of the asserted consent of the female victims to the predicate offenses and the uncharged conduct. The court responded that the issue of consent was "not relevant and germane at this point."

Second, defendant would testify that "he has not refused to take medication to the extent that people in this case have testified to; that he has basically been glad to take medication that he's been offered except for some further and subsequent understanding regarding the side effects." The court asked defendant, "Is that correct?" Defendant responded, "Um, yes. To a degree." The court acknowledged the relevance of such testimony but "suspect[ed] that as soon as he testified in that area, there would be rebuttal testimony on behalf of the People, and it might be counterproductive for him." Defense counsel agreed with the court's assessment. The court observed that "if Counsel has made a decision from a tactical standpoint, the Court has to recognize that decision." The court then inquired whether counsel had adequately described the reasons for counsel's decision. Defendant responded that "he has a right to his opinion, but I do have a right to testify." Defendant also asserted that the SVPA afforded him a statutory right to testify. The court explained to defendant that this is not a criminal proceeding, and informed defendant that "the decision by trial counsel is paramount."

Third, in response to a question from the court, directed to defendant, whether there were any other areas about which he wished to testify, defendant responded "inappropriate behavior."[7] Counsel then explained, "as an offer of proof I believe he would deny many of the allegations that have been made." Defendant interjected, "No. I wouldn't deny." Counsel then stated, "or even worse, I think he would testify that—that the women somehow flirted with or made some advancements towards him. I think the

---

[7] Defendant's reference to "inappropriate behavior" apparently concerned his conduct in Atascadero, and perhaps his conduct in prison. The phrase "inappropriate behavior" was used throughout the proceeding to refer to defendant's conduct at these two institutions. In addition, the prosecutor responded to this proffer of testimony by confirming that Dr. Rowland "could testify to each and every incident." Defendant disputed the value of Dr. Rowland's testimony, but did not suggest that his own testimony would concern "inappropriate behavior" other than the incidents Dr. Rowland might address.

Court can understand why I believe that testimony would be counterproductive." Defendant did not disagree with counsel's amended description of his proffered testimony. The court predicted that the People would call a witness to rebut such testimony, and the district attorney stated that she would "have Dr. Rowland here who could testify to each and every incident, if we have to, and take the records apart." Defendant countered that Dr. Rowland "doesn't see me. He just looks at the reports, and people write reports, you know. People falsify information." The court responded, "I think it boils down to an issue of credibility, and I don't think it would be in your best interest."

The court proceeded with the trial, without testimony from defendant, and the jury found true the allegation that defendant meets the criteria of a sexually violent predator pursuant to sections 6600 through 6604.

## II.

■ The SVPA was enacted to identify incarcerated individuals who suffer from mental disorders that predispose them to commit violent criminal sexual acts, and to confine and treat such individuals until it is determined they no longer present a threat to society. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143–1144 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*).) At the time of the underlying proceeding to extend defendant's commitment, the Act defined a sexually violent predator as "a person who has been convicted of a sexually violent offense against two or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Former § 6600, subd. (a)(1), as amended by Stats. 2000, ch. 643, § 1.)[8] ■ " 'Sexually violent offense[s]' " consist of enumerated sex crimes "when committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person . . . ." (§ 6600, subd. (b).) In addition, if one of these enumerated crimes is committed against a child under the age of 14 years, the crime constitutes a " 'sexually violent offense.' " (§ 6600.1, subd. (a).)

■ The process for confining an individual pursuant to the SVPA begins when the Secretary of the Department of Corrections and Rehabilitation determines that an individual in the custody of the department may be a sexually violent predator, and the secretary refers the individual to the State Department of Mental Health for an evaluation. If two evaluators concur that

---

[8] Proposition 83 amended the definition of a sexually violent predator to include individuals who have been convicted of a sexually violent offense against *one* or more victims. (§ 6600, subd. (a)(1).)

the individual meets the statutory criteria of a sexually violent predator, the Director of Mental Health shall request the county in which the person was convicted of the offense for which he or she is incarcerated to file a petition for commitment under the SVPA. (§ 6601.)

█ If the trial court determines that the petition establishes "probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release," the court shall order a trial to determine whether the person is a sexually violent predator. (§§ 6601.5, 6602.) The individual "shall be entitled to a trial by jury, to the assistance of counsel, to the right to retain experts or professional persons to perform an examination on his or her behalf, and to have access to all relevant medical and psychological records and reports." (§ 6603, subd. (a).) If the individual is indigent, the court shall appoint counsel and assist the individual in obtaining an expert evaluation and expert assistance at trial. (*Ibid.*) To secure the individual's commitment, the district attorney must prove beyond a reasonable doubt that the person is a sexually violent predator. (§ 6604.) When a jury decides the case, its verdict must be unanimous. (§ 6603, subd. (f).) The statutory scheme does not, however, expressly grant the defendant a right to testify.

At the time of the hearing upon the petition to extend defendant's commitment, the SVPA provided: "If the court or jury determines that the person is a sexually violent predator, the person shall be committed for two years to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health . . . ." (Former § 6604, as amended by Stats. 2000, ch. 420, § 3.)[9] The Act also required, at least once a year, an examination of the defendant's mental condition, and afforded the defendant a right to retain or, if indigent, to have appointed, an expert to examine the defendant and review all records concerning the defendant. (Former § 6605, subd. (a), added by Stats. 1995, ch. 763, § 3, p. 5922.)[10] The Act required notice to a defendant

---

[9] Proposition 83 amended section 6604 to provide that "the person shall be committed for *an indeterminate term* to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health . . . ." (§ 6604, italics added.)

[10] Proposition 83 retained these provisions, and added requirements concerning the content and dissemination of the annual report on the defendant's mental condition: "The annual report shall include consideration of whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community. The Department of Mental Health shall file this periodic report with the court that committed the person under this article. The report shall be in the form of a declaration and shall be prepared by a professionally qualified person. A copy

of his or her right to petition the court for conditional release. If a defendant did not affirmatively waive the right to seek conditional release, the Act required the court to "set a show cause hearing to determine whether facts exist that warrant a hearing on whether [the defendant's] condition has so changed that he . . . would not be a danger to the health and safety of others if discharged." (Former § 6605, subd. (b), added by Stats. 1995, ch. 763, § 3, p. 5926.)[11] If such facts were found, the court was required to hold a hearing on the issue, at which the defendant would be entitled to all of the constitutional protections afforded at his or her initial commitment hearing. (§ 6605, subds. (c), (d).) A verdict against the defendant would result in a new two-year commitment, and a verdict for the defendant would lead to his or her unconditional release. (Former § 6605, subd. (e), added by Stats. 1995, ch. 763, § 3, p. 5926.)[12] Alternatively, if the State Department of Mental Health had reason to believe the defendant no longer was a sexually violent predator, it was required to seek judicial review of the commitment pursuant to section 7250. (§§ 6605, subd. (f), 7250 [any person who has been committed to a state hospital for the mentally disordered is entitled to a writ of habeas corpus upon a proper application by the State Department of Mental Health, the person, or a friend or relative].) Finally, the SVPA did not "prohibit the person who has been committed as a sexually violent predator from petitioning the court for conditional release and subsequent unconditional discharge without the recommendation or concurrence of the Director of Mental Health." (Former § 6608, subd. (a), added by Stats. 1995, ch. 763, § 3, p. 5922.)[13] No hearing could be held on a defendant's petition, however, until the defendant had been committed for at least one year. (§ 6608, subd. (c).)

---

of the report shall be served on the prosecuting agency involved in the initial commitment and upon the committed person." (§ 6605, subd. (a).)

[11] Proposition 83 replaced subdivision (b)'s provisions concerning notice of the defendant's right to petition for conditional release and the court's duty to set a show cause hearing, with provisions that require the State Department of Mental Health to authorize the defendant "to petition the court for conditional release to a less restrictive alternative or for an unconditional discharge" "[i]f the Department of Mental Health determines that either: (1) the person's condition has so changed that the person no longer meets the definition of a sexually violent predator, or (2) conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community." (§ 6605, subd. (b).) Upon receipt of a petition, the court "shall order a show cause hearing at which the court can consider the petition and any accompanying documentation provided by the medical director, the prosecuting attorney or the committed person." (*Ibid.*)

[12] Proposition 83 amended section 6605, subdivision (e), to provide that a commitment will be for an indeterminate period.

[13] The current version of section 6608 provides that a person committed under the SVPA is not prohibited from petitioning for "conditional release *or* an unconditional discharge" (italics added), and requires that the person petitioning for such relief serve a copy of the petition upon the State Department of Mental Health.

III.

 The defendant in a criminal proceeding has a right to testify over the objection of his or her counsel. As we have explained in that context, "the right to testify in one's own behalf is of such fundamental importance that a defendant who timely demands to take the stand contrary to the advice given by his counsel has the right to give an exposition of his defense before a jury. (*People v. Blye*[ (1965)] 233 Cal.App.2d 143, 149 [43 Cal.Rptr. 231].) The defendant's insistence upon testifying may in the final analysis be harmful to his case, but the right is of such importance that every defendant should have it in a criminal case. Although normally the decision whether a defendant should testify is within the competence of the trial attorney (see *People v. Gutkowsky*[ (1963)] 219 Cal.App.2d 223, 227 [33 Cal.Rptr. 79]), where, as here, a defendant insists that he wants to testify, he cannot be deprived of that opportunity." (*People v. Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710], fn. omitted (*Robles*).)

 Proceedings to commit an individual as a sexually violent predator in order to protect the public are civil in nature. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 361–369 [138 L.Ed.2d 501, 117 S.Ct. 2072] [because Kansas's sexually violent predator scheme was not intended to punish, it did not violate ex post facto prohibition or constitute double jeopardy]; *Hubbart, supra,* 19 Cal.4th 1138, 1170–1179 [because California's SVPA does not inflict punishment, it does not violate the federal or state ex post facto clauses]; see § 6250 [persons subject to commitment under the SVPA "shall be treated, not as criminals, but as sick persons"].) Therefore, the Fifth Amendment's guarantee against compulsory self-incrimination does not apply in proceedings under the SVPA. (*Allen v. Illinois* (1986) 478 U.S. 364, 375 [92 L.Ed.2d 296, 106 S.Ct. 2988]; *People v. Leonard* (2000) 78 Cal.App.4th 776 [93 Cal.Rptr.2d 180] (*Leonard*).) Nor do the Sixth Amendment rights to self-representation and to confront witnesses apply in such proceedings. (*People v. Otto* (2001) 26 Cal.4th 200, 214 [109 Cal.Rptr.2d 327, 26 P.3d 1061] (*Otto*) [reliable hearsay statements concerning the predicate offenses are admissible in an SVPA proceeding; "[t]here is no right to confrontation under the state and federal confrontation clause in civil proceedings"]; *People v. Fraser* (2006) 138 Cal.App.4th 1430, 1446 [42 Cal.Rptr.3d 424] (*Fraser*) ["because a civil commitment proceeding under the SVPA has a nonpunitive purpose and is therefore not equivalent to a criminal prosecution, we determine that there is no Sixth Amendment right to self-representation in SVPA proceedings"]; *People v. Angulo* (2005) 129 Cal.App.4th 1349, 1367 [30 Cal.Rptr.3d 189] [rejecting reliance upon *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] in an SVP proceeding,

because *Crawford* "was based solely on the Sixth Amendment right of confrontation"].)

Notwithstanding the repeated rejection in these and other cases of the applicability of constitutional rights afforded to criminal defendants in the context of proceedings under the SVPA, defendant contends that the right of a criminal defendant to testify over the objection of his or her counsel should apply in such proceedings because these proceedings include many of the procedural protections afforded in criminal cases, such as the right to court-appointed counsel and experts, the right to trial by jury and a unanimous verdict, and the requirement of proof beyond a reasonable doubt to support the verdict. This theory for the importation of criminal constitutional rights into civil commitment proceedings has been rejected in other cases. The state's provision of procedural protections similar to those afforded criminal defendants "does not transform a civil commitment proceeding into a criminal prosecution." (*Kansas v. Hendricks, supra*, 521 U.S. at 364–365; see also *Hubbart, supra*, 19 Cal.4th at p. 1174, fn. 33 ["the use of procedural safeguards traditionally found in criminal trials [does] not mean that commitment proceedings [are] penal in nature"].) Defendant also cites the circumstance that both criminal and SVPA proceedings are brought by the district attorney or the attorney general in the name of the People, and notes that both types of proceedings concern "the defendant's liberty interests and society's interest in protecting itself against dangerous persons." These observations fail to establish that proceedings under the SVPA share the characteristics necessary to transform a civil commitment proceeding into a criminal proceeding, the latter having the underlying purpose of punishing the defendant. (*Hubbart, supra*, 19 Cal.4th at p. 1171.)

Defendant next contends that Proposition 83, which was approved by the voters in November 2006, establishes that a purpose of proceedings under the SVPA is to punish individuals found to be sexually violent predators. The trial of the allegations under the petition to extend defendant's commitment occurred in 2005, prior to the passage of Proposition 83. Moreover, defendant's reliance upon references in the preamble of Proposition 83 to "adequate penalties" and "laws that punish," and upon the circumstance that many of the amendments made by Proposition 83 concern the punishment of sex offenders, is misplaced. Proposition 83 amended the Penal Code as well as the Welfare and Institutions Code. The intent to punish sexually violent predators through Penal Code provisions that apply to criminal prosecutions does not establish an intent to punish sexually violent predators through Welfare and Institutions Code provisions that apply to civil commitment proceedings. Although Proposition 83 made amendments to both the criminal and the civil schemes, it recognized the different purposes of these two

schemes, stating in the preamble: "Existing laws *that punish* aggravated sexual assault, habitual sexual offenders, and child molesters must be strengthened and improved. *In addition*, existing laws *that provide for the commitment and control* of sexually violent predators must be strengthened and improved." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 2, subd. (h), p. 127, italics added.) For the same reason, the argument of the proponents of Proposition 83 that "[o]ur families deserve the protection of a tough sex offender punishment and control law" (Voter Information Guide, Gen. Elec., *supra*, argument in favor of Prop. 83, p. 46) does not establish that the provisions of Proposition 83 addressing the civil commitment of sexually violent predators were intended to punish defendants.

## IV.

■ Our conclusion that the right of a criminal defendant to testify over the objection of his or her counsel does not extend to an individual who is the subject of a proceeding under the SVPA does not end our analysis. "Because civil commitment involves a significant deprivation of liberty, a defendant in an SVP[A] proceeding is entitled to due process protections. (*Foucha v. Louisiana* (1992) 504 U.S. 71, 80 [112 S.Ct. 1780, 118 L.Ed.2d 437].)" (*Otto, supra*, 26 Cal.4th at p. 209; see *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.* (2000) 528 U.S. 152, 161 [145 L.Ed.2d 597, 120 S.Ct. 684] ["In light of our conclusion that the Sixth Amendment does not apply to appellate proceedings, any individual right to self-representation on appeal based on autonomy principles must be grounded in the Due Process Clause."]; *Fraser, supra*, 138 Cal.App.4th at p. 1446 ["Absent a Sixth Amendment right [to self-representation in SVPA proceedings], the individual right to self-representation 'must be grounded in the Due Process Clause.' "].)

■ " 'Once it is determined that [the guarantee of] due process applies, the question remains what process is due.' (*Morrissey v. Brewer* (1972) 408 U.S. 471, 481 [92 S.Ct. 2593, 33 L.Ed.2d 484].) We have identified four relevant factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (4) the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a

responsible government official. (*[In re] Malinda S.* [(1990)] 51 Cal.3d [368,] 383 [272 Cal.Rptr. 787, 795 P.2d 1244].)" (*Otto, supra,* 26 Cal.4th at p. 210.)[14]

We begin with the private interests at stake. As we noted in *Otto, supra,* 26 Cal.4th 200, "the private interests that will be affected by [a finding that the defendant continues to be a sexually violent predator] are the significant limitations on [the defendant's] liberty, the stigma of being classified as [a sexually violent predator], and subjection to unwanted treatment. [Citation.]" (*Id.* at p. 210.) The circumstance that a commitment is civil rather than criminal scarcely mitigates the severity of the restraint upon the defendant's liberty. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 223–227 [152 Cal.Rptr. 425, 590 P.2d 1].) "[T]he California Legislature has recognized that the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction." (*In re Gary W.* (1971) 5 Cal.3d 296, 307 [96 Cal.Rptr. 1, 486 P.2d 1201] [holding that the right to trial by jury is a requirement of due process and equal protection in a proceeding to extend detention by the Youth Authority for treatment].) Thus, the first factor weighs heavily in favor of providing all reasonable procedures to prevent the erroneous deprivation of liberty interests.[15]

Second, we consider the risk, in the absence of a right to testify, of an erroneous finding that the defendant is a sexually violent predator and the probable value, in reducing this risk, of allowing him or her to testify over the objection of counsel. In evaluating this factor, the Court of Appeal looked to the analysis in *Otto, supra,* 26 Cal.4th 200. *Otto* addressed section 6600, subdivision (a)(3), which authorizes the admission of documentary evidence—including preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of Mental Health—to establish the details surrounding the commission of predicate offenses. The defendant in *Otto* contended that reliance upon hearsay evi-

---

[14] Defendant does not distinguish between his rights under the federal and state Constitutions. "Although the state and federal Constitutions differ somewhat in determining when due process rights are triggered, once it has been concluded that a due process right exists we balance similar factors under both approaches to decide what process is due." (*In re Malinda S., supra,* 51 Cal.3d at p. 383, fn. omitted; see also *Hubbart, supra,* 19 Cal.4th at p. 1152, fn. 19 ["While we recognize our power and authority to construe the state Constitution independently [citation], we find no pressing need to do so here."].)

[15] To the extent Proposition 83 has increased the burden upon liberty interests by requiring only one predicate offense and imposing an indeterminate term of commitment, it has increased the weight of the first factor.

dence in such reports violated his due process right to be convicted only upon reliable evidence. In addressing whether the challenged procedure enhanced the risk of an erroneous deprivation of the defendant's liberty interests, the court in *Otto* agreed that "the victim hearsay statements must contain special indicia of reliability to satisfy due process," because hearsay "permeates not only the substantial sexual conduct component of the prior crime determination, but also the psychological experts' 'conclusion that [Otto] was and remained a pedophile . . . likely to reoffend.' [Citation.] Thus, if these facts are unreliable, a significant portion of the foundation of the resulting [sexually violent predator] finding is suspect." (*Otto, supra,* 26 Cal.4th at pp. 210–211.) We concluded in *Otto* that "the victims' hearsay statements possess sufficient indicia of reliability to satisfy due process." (*Id.* at p. 211.) We added: "Implicit in the above discussion are other factors (in addition to the reliability of the victims' hearsay statements) that diminish the risk of an erroneous deprivation of rights as a result of reliance on the hearsay statements, and the probable value of additional or substitute procedural safeguards. Otto had the opportunity to present the opinions of two psychological experts, and cross-examine any prosecution witness who testified. Moreover, the trial court retained discretion under Evidence Code section 352 to exclude unreliable hearsay, which acted as a further safeguard against any due process violation." (*Id.* at p. 214.)

*Otto*'s focus upon the reliability of the hearsay evidence admitted in that case led the Court of Appeal in the present case to evaluate the reliability of defendant's proffered testimony. The appellate court concluded that "the reliability of defendant's testimony is highly questionable. Not only was there strong incentive for him to fabricate but, in addition, defendant's own attorney advised defendant against testifying, thus indicating that his testimony would not be beneficial to defendant's defense. Defendant further lacked credibility as a witness. His proffered testimony was not believable, i.e., that his victims consented to the sexual acts and Atascadero staff members were flirting with him. Defendant's testimony had little if any probable value as an additional safeguard against the erroneous deprivation of his private interests affected by SVP proceedings."

■ *Otto, supra,* 26 Cal.4th 200, concerned the admission of a category of evidence—hearsay—that generally is considered unreliable. (See *Chambers v. Mississippi* (1973) 410 U.S. 284, 298 [35 L.Ed.2d 297, 93 S.Ct. 1038] ["The hearsay rule . . . is . . . grounded in the notion that untrustworthy evidence should not be presented to the triers of fact."].) Because hearsay evidence tends to be unreliable, as a general matter its admission may contribute to an erroneous result unless indicia of reliability are established. In contrast, trial testimony from a witness sworn to tell the truth and subject

to cross-examination is not considered, as a general proposition, to be unreliable. Although, as explained below, we agree with the Court of Appeal that defendant's testimony would not have assisted him in preserving his liberty interests in this case, here we seek to establish a rule of general application in proceedings under the SVPA. "[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." (*Mathews v. Eldridge* (1976) 424 U.S. 319, 344 [47 L.Ed.2d 18, 96 S.Ct. 893].) Therefore, we consider generally whether allowing a defendant in a proceeding under the SVPA to testify over the objection of his or her counsel may aid the defendant in preventing the erroneous deprivation of liberty interests, rather than whether the right would aid the particular defendant before us.

Absent the objection of defendant's counsel, defendant would have been permitted to testify to the extent his testimony was admissible and sufficiently relevant. (See *Guardianship of Waite* (1939) 14 Cal.2d 727, 729–730 [97 P.2d 238] [in a conservatorship proceeding, it was error to allow only expert testimony, and to preclude the individual who was the subject of the conservatorship proceeding from testifying]; *Caldwell v. Caldwell* (1962) 204 Cal.App.2d 819, 821 [22 Cal.Rptr. 854] [in a marital dissolution proceeding, it was error to preclude a parent from testifying concerning the need for increased child support].) In addition, as has been recognized in cases in which a sexually violent predator has asserted the privilege against self-incrimination, the defendant's participation in the proceedings, through pre-trial interviews and testimony at trial, generally enhances the reliability of the outcome.[16] Moreover, as observed in *Otto, supra,* 26 Cal.4th 200, if critical

---

[16] In *Allen v. Illinois, supra,* 478 U.S. 364, the high court rejected a claim that the defendant in a civil proceeding to commit the defendant as a sexually dangerous person has a privilege against self-incrimination based upon the due process clause. In the course of discussing the impact such a privilege would have upon the reliability of those proceedings, the court stated that "the State takes the quite plausible view that denying the evaluating psychiatrist the opportunity to question persons alleged to be sexually dangerous would decrease the reliability of a finding of sexual dangerousness." (*Allen,* at pp. 374–375, italics omitted.) Similarly, the court in *Leonard, supra,* 78 Cal.App.4th 776, which considered the claim of a defendant in a sexually violent predator proceeding that he could not be forced to speak to a psychiatrist or to take the stand at trial, observed that "the inmate's participation enhances the reliability of the outcome." (*Id.* at p. 793.)

The People assert defendant will testify falsely, and therefore his testimony will not enhance the reliability of the outcome. Of course, a right to testify does not authorize a witness to commit perjury, and counsel must not cooperate in a client's perjury. (*LaChance v. Erickson* (1998) 522 U.S. 262, 266 [139 L.Ed.2d 695, 118 S.Ct. 753] ["a criminal defendant's right to testify does not include the right to commit perjury"]; *Nix v. Whiteside* (1986) 475 U.S. 157, 173 [89 L.Ed.2d 123, 106 S.Ct. 988] ["a lawyer who would . . . cooperate [with planned perjury] would be at risk of prosecution for suborning perjury, and disciplinary proceedings, including suspension or disbarment"].) Defendant's counsel did not suggest, however, that defendant would testify falsely. The circumstance that defendant's perception of reality is at variance with the perception of his victims and of the staff at the prison and Atascadero does not

information, such as the details surrounding the commission of the predicate offenses, is questionable, "a significant portion of the foundation of the resulting [sexually violent predator] finding is suspect." (*Otto, supra*, 26 Cal.4th at pp. 210–211.) Because the testimony of a defendant typically will concern his or her conduct, this testimony may relate to information that is critical to the experts' testimony. Attorneys are not infallible in appraising their clients and in assessing the impression a client's testimony may have on a jury, or in evaluating the credibility of other witnesses. In some cases, the defendant's testimony may raise a reasonable doubt concerning the facts underlying the experts' opinions. Accordingly, in every case there exists a risk that allowing counsel to preclude the defendant from testifying will lead to an erroneous deprivation of rights. Guaranteeing the defendant a right to testify, even over counsel's objection, will mitigate this risk. The potential consequence of the defendant's testimony being harmful to his or her case does not justify a rule that would bar a defendant from testifying absent the concurrence of his or her counsel. For these reasons, we conclude the second factor weighs in favor of allowing the defendant to testify over the objection of counsel.

Third, we consider "the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Otto, supra*, 26 Cal.4th at p. 210.) The government has a strong interest in protecting the public from sexually violent predators, and in providing treatment to these individuals. (*People v. Vasquez* (2001) 25 Cal.4th 1225, 1232 [108 Cal.Rptr.2d 610, 25 P.3d 1090]; *Hubbart, supra*, 19 Cal.4th at pp. 1143–1144.) Because the defendant's participation in the proceedings through his or her testimony at trial generally enhances the reliability of the outcome, the recognition of a right to testify over the objection of counsel may serve the government's interest in securing an accurate factual determination concerning the defendant's status as a sexually violent predator. If, contrary to defense counsel's expectation, the defendant's testimony is credible and beneficial to the defendant, the prosecution may elect to present additional witnesses to rebut that testimony, and this may add to the government's burden. That possibility, however, presents a consequence no different from the situation faced by the

establish that defendant was being untruthful. Rather, based upon the testimony of Dr. Rowland, it appears that defendant's perception that numerous women flirted with him may be bona fide, and may be evidence of erotomania. The possibility that a defendant in an SVPA proceeding may testify untruthfully does not justify conferring upon counsel the authority, solely for strategic reasons, to preclude his or her client from testifying.

prosecution when the defendant's counsel has elected to have his or her client testify, and it affords no legitimate reason to preclude the defendant from testifying.[17]

The fiscal and administrative burdens associated with a right to testify over counsel's objection are de minimis. As noted above, the defendant generally has a right to testify in such proceedings, subject to the rules of evidence and procedure. Therefore, recognizing a right of the defendant to testify against the advice of counsel will lengthen the proceedings only in that subset of cases in which the defendant's counsel determines not to call the defendant to testify and the defendant decides to reject counsel's advice and insists upon his or her right to testify. The added expense of receiving the defendant's testimony in those relatively few cases is of course no reason to deny the defendant a right to testify. (See *Lassiter v. Department of Social Services* (1981) 452 U.S. 18, 28 [68 L.Ed.2d 640, 101 S.Ct. 2153] [government's pecuniary interest in not appointing counsel for parents in parental rights termination proceedings "is legitimate, [but] it is hardly significant enough to overcome private interests as important as those here, particularly in light of the concession" that the costs would be de minimis compared to the costs of appointed counsel in criminal matters].)

The state contends it "has a strong interest in not allowing the defendant to sabotage the proceedings for purposes of his own amusement or otherwise commit perjury and thereby degrade the integrity of the process as a whole. (See *Harris v. New York* [(1971)] 401 U.S. [222,] 225 [28 L.Ed.2d 1, 91 S.Ct. 643] [although every criminal defendant has the privilege to testify in his own defense, 'that privilege cannot be construed to include the right to commit perjury'].)" As we have noted, a right to testify over the objection of

---

[17] In *Otto, supra,* 26 Cal.4th 200, we recognized that "[r]equiring the government to adduce live testimony from the victims could potentially impede [the purpose of protecting the public]. The SVP proceeding occurs at the end of the defendant's sentence, which may be years after the events in question. As one Court of Appeal has observed, if the People can 'obtain civil commitment of sexually violent predators only in cases where the conviction record was extensive, and included victim testimony . . . as to the details of the sexually violent offense,' in those cases where 'the defendant pled guilty before the preliminary hearing, or the victims' testimony was not sufficient to establish the details of the offense as required by the SVP Act, the state would never be able to meet its burden.' [Citation.]" (*Id.* at pp. 214–215.) Because we held in *Otto* that the circumstances of the predicate offenses may be established by hearsay, it is unnecessary for the prosecution to call witnesses to establish the nature of the predicate offenses.

Depending upon the particular facts of the case and the defendant's testimony, the prosecution may find it necessary to present witnesses concerning the defendant's subsequent conduct while confined in prison or in a mental institution, but the presentation of more recent evidence concerning the defendant's continuing inability to control his or her conduct should pose less of a burden than the presentation of evidence concerning the predicate offenses. Moreover, as explained below, this burden should arise in only a relatively small percentage of the cases.

counsel does not authorize a witness to commit perjury. (See fn. 16, *ante.*) In addition, a right to testify does not entitle a defendant "to lash out at the SVPA process to a captive audience of jurors," as the state fears will occur. As in all cases, the trial court retains authority to manage the proceedings and to prohibit abusive conduct by the parties. (Code Civ. Proc., § 128.) The possibility that a defendant in a sexually violent predator proceeding may attempt to disrupt the proceedings or may testify falsely does not justify denying all defendants in such proceedings a right to testify over the objection of counsel.

Because the number of cases in which (1) counsel advises the defendant not to testify, (2) the defendant nonetheless elects to testify, and (3) the defendant's testimony hinders rather than assists the prosecution's overall case will be small, and because the added burden on the prosecution of responding to a credible defense most certainly is not a legitimate reason to preclude the defendant from testifying, we conclude that the third factor does not weigh against allowing the defendant to testify against the advice of counsel.

■ Finally, we consider "the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official. [Citation.]" (*Otto, supra,* 26 Cal.4th at p. 210.) Considering the question of a defendant's right to self-representation in proceedings under the SVPA, the appellate court in *Fraser, supra,* 138 Cal.App.4th 1430, stated: "[t]he SVPA contains built-in procedural safeguards to protect the dignitary interest, which include the commencement of the proceedings by a petition supported by the concurring opinions of two psychologists (§ 6604.1, subd. (b)); the right to have access to relevant medical and psychological reports and records (§ 6603, subd. (a)); the right to retain experts to perform an examination (§ 6603, subd. (a)); the right to a probable cause hearing (§ 6602, subd. (a)); the right to a jury trial (§ 6604.1, subd. (b)); and the right to be present at the hearing (§ 6605, subd. (c)). [¶] The SVPA also provides for the right to counsel at section 6603, subdivision (a). Accordingly, self-representation is not necessary for a defendant to be informed about the SVPA proceeding or to preserve the ability to tell his or her side of the story, since these rights can be protected by counsel." (*Id.* at pp. 1448–1449.)

We agree with the court in *Fraser, supra,* 138 Cal.App.4th 1430, that the SVPA scheme informs the defendant of the nature, grounds, and consequences of the proceeding. But in a case in which the defendant's counsel declines to agree to allow the defendant testify, mandatory representation by counsel (which generally is beneficial in assisting a defendant in telling his or her story) may impair the defendant's ability to present his or her side.

Although it is true, as the Court of Appeal noted, that a defendant generally can communicate his or her version to and through the experts and counsel and through other witnesses, these means all involve a filtering process before the story reaches the finder of fact. In a case in which the experts do not believe the defendant and in which counsel concludes the defendant's testimony will have a negative impact on the outcome, the defendant's story may not reach the fact finder.[18]

 Because a defendant in a proceeding under the SVPA has no right to represent himself or herself and no privilege against self-incrimination, denial of a right to testify over the objection of counsel might relegate the defendant to the role of a mere spectator, with no power to attempt to affect the outcome. The defendant might be both forced to testify as to matters the prosecution seeks to establish, and prevented from testifying as to matters the defendant seeks to establish, or might be ignored. The circumstance that the defendant may fare better by remaining silent at trial does not negate the dignitary interest in being heard. The government has no interest in assuming a paternal role to prevent a defendant from pursuing a strategically misguided path in a proceeding under the SVPA. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' [Citation.]" (*Mathews v. Eldridge, supra,* 424 U.S. at p. 333.) Because denial of a right to testify over the objection of counsel would impair the defendant's ability to be heard, we conclude that the fourth factor weighs in favor of allowing the defendant to testify against the advice of counsel.

 In summary, (1) the private interests at stake in an SVPA proceeding are significant; (2) there is a risk counsel may misjudge the effect the defendant's testimony will have upon the finder of fact, and allowing the defendant to testify over the objection of counsel will mitigate the risk of an erroneous deprivation of the defendant's liberty interests that might result from counsel's misjudgment; (3) as a general matter, the government's interest in protecting its citizens and treating sexually violent predators pursuant to an efficient procedure is not significantly burdened by allowing such testimony—and, in any event, this burden would not justify deprivation of the defendant's right to testify; and (4) the defendant's dignitary interest in

---

[18] The Court of Appeal concluded that "defendant had ample opportunity to tell his version in the underlying criminal proceedings and during his psychological examinations, as well as through his attorney, cross-examination of witnesses, and presenting his own witnesses." Defendant pleaded guilty to the charges in the underlying proceeding, and therefore did not present his story concerning the details surrounding the offenses. Although defendant could tell his story to the psychologists, this forum did not ensure that *his* story would reach the trier of fact. And because defendant's attorney believed defendant's story would be detrimental to the effort to avoid further confinement, counsel presumably did not attempt to present that story through cross-examination and the presentation of witnesses.

presenting his or her side of the story is protected by allowing the defendant to testify despite counsel's judgment that such testimony will be detrimental. Therefore, we conclude that the balancing test set forth above establishes that the defendant in a sexually violent predator proceeding has a right under the due process clauses of the federal and state Constitutions to testify, in accordance with the rules of evidence and procedure, over the objection of counsel.

██ In opposing this conclusion, the People rely upon the principle that counsel has the authority to control strategic decisions in litigation. We agree that counsel generally has such authority, but in light of our conclusion that allowing counsel to preclude the defendant from testifying in an SVPA proceeding violates his or her due process rights, counsel's authority must yield to the defendant's choice in this context. (See *Robles, supra,* 2 Cal.3d at p. 215 [trial counsel normally may decide whether a defendant in a criminal proceeding should testify, but when "a defendant insists that he wants to testify, he cannot be deprived of that opportunity"].)

V.

Having decided it was error to preclude defendant from testifying, we next consider whether the judgment extending defendant's commitment must be reversed. Defendant contends the denial of his right to testify is "structural" error, requiring automatic reversal. Respondent urges application of harmless error analysis, and claims the error was harmless beyond a reasonable doubt.

██ The United States Supreme Court "has recognized that most consti-tutional errors can be harmless. [Citations.]" (*Arizona v. Fulminante* (1991) 499 U.S. 279, 306 [113 L.Ed.2d 302, 111 S.Ct. 1246] (*Fulminante*).) "The common thread connecting [cases in which the high court has applied the harmless error standard] is that each involved 'trial error'—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reason-able doubt." (*Id.* at pp. 307–308.) Among the examples *Fulminante* cited of cases involving trial error subject to harmless error analysis were *Crane v. Kentucky* (1986) 476 U.S. 683, 691 [90 L.Ed.2d 636, 106 S.Ct. 2142] (citing the constitutional rights to present a complete defense and to an opportunity to be heard, the high court held that exclusion of evidence concerning the credibility of the defendant's confession was error, and that the error should be subject to harmless error analysis), and *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684 [89 L.Ed.2d 674, 106 S.Ct. 1431] (trial court ruling that prohibited the defendant from inquiring into the possibility that a witness was biased as a result of the state's dismissal of a charge against the witness

violated the defendant's rights under the confrontation clause; although the erroneous ruling involved the exclusion rather than the admission of evidence, "the reviewing court should be able to decide whether the not-fully-impeached evidence might have affected the reliability of the factfinding process at trial"; accordingly, the error was reviewable under the harmless error standard).

The court in *Fulminante* contrasted these examples of trial error with structural errors such as denial of the right to representation by counsel, or to trial before a judge who is not impartial. "These are structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards. The entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial. Since our decision in *Chapman*, [*supra*, 386 U.S. 18,] other cases have added to the category of constitutional errors which are not subject to harmless error the following: unlawful exclusion of members of the defendant's race from a grand jury [citation]; the right to self-representation at trial [citation]; and the right to public trial [citation]. Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." (*Fulminante, supra*, 499 U.S. at pp. 309–310.)

The denial of defendant's right to testify did not affect any aspect of his trial other than his ability to present personal testimony; it was "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented . . . ." (*Fulminante, supra*, 499 U.S. at pp. 307–308.) For these reasons, the error was trial error rather than structural error. (See *People v. Johnson* (1998) 62 Cal.App.4th 608, 634–636 [72 Cal.Rptr.2d 805] [the court rejected the argument that improper denial of a defendant's right to testify is structural error, and applied the *Chapman* standard]; *People v. Hayes* (1991) 229 Cal.App.3d 1226, 1234, fn. 11 [280 Cal.Rptr. 578] [the court stated in dicta that any error in excluding the defendant from the courtroom and thereby preventing him from testifying was subject to harmless error analysis under *Chapman*]; *Martinez v. Ylst* (9th Cir. 1991) 951 F.2d 1153, 1157 (*Martinez*) [an erroneous ruling that certain prior offenses could be introduced to impeach the defendant led to defendant's decision not to testify; the court concluded: "we must reverse unless the state can demonstrate that the error was harmless beyond a reasonable doubt"]; see also *People v. Jablonski* (2006) 37 Cal.4th 774, 816–817 [38 Cal.Rptr.3d 98, 126 P.3d 938] [the defendant claimed the erroneous admission of his confession prevented him from testifying; the court rejected his assertion the error was reversible per se].) Therefore, we evaluate whether the error committed in the present case was harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. 18, 24

["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"]; *People v. Hurtado* (2002) 28 Cal.4th 1179, 1194 [124 Cal.Rptr.2d 186, 52 P.3d 116] ["Because the *Chapman* test . . . is used for the review of federal constitutional error in civil commitment cases in California generally, that test necessarily governs review under the SVPA."].)

■ Defendant asserts "it is sheer speculation to say that [his] testimony would have made no difference. The jury was never able to assess his credibility." We agree that issues of credibility are for the jury to resolve. For this reason, "it is only the most extraordinary of trials in which a denial of the defendant's right to testify can be said to be harmless beyond a reasonable doubt. [Citation.]" (*Martinez, supra,* 951 F.2d 1153, 1157.) Nonetheless, if the facts to which a defendant offered to testify would not have affected the verdict, the exclusion of his or her testimony was harmless. Therefore, we consider the facts defendant sought to establish.[19]

First, defendant proposed to address the issue of the victims' consent to the predicate offenses and to the uncharged conduct. Defendant pleaded guilty to the predicate offenses, and therefore was precluded from contending that the victims consented. Moreover, the proceeding in which defendant originally was adjudicated a sexually violent predator necessarily established that the two convictions were "sexually violent offenses" within the meaning of section 6600. Therefore, testimony that Sandra C. and Lisa L. consented was irrelevant.

Even if defendant could have convinced any juror that whatever transpired in the incidents involving Rhonda A., Tambria R., and Melanie H. might have been consensual, this feat would have made no difference in the outcome.[20]

---

[19] To preserve a contention that evidence should have been admitted, a party's offer of proof must make clear the substance of the proffered testimony. (See *People v. Whitt* (1990) 51 Cal.3d 620, 649 [274 Cal.Rptr. 252, 798 P.2d 849] ["We do not read *Chapman* . . . as placing an impossible 'burden' upon the People, such that a defendant who withholds the nature of excluded evidence at trial is guaranteed reversal on appeal."].) We acknowledge that when a defendant's counsel seeks to prevent the defendant from testifying, an appellate court reasonably might view counsel's summary of the proffered evidence with suspicion. In the present case, however, counsel described with adequate detail the facts defendant sought to establish through his testimony, and defendant did not hesitate to argue personally in favor of his right to testify and to clarify the facts to which he would testify. Under these circumstances, it is reasonable to accept counsel's and defendant's descriptions of the proffered testimony.

[20] We note that the circumstances surrounding the uncharged conduct weigh heavily against defendant's claim of consent. His claim that Melanie H., 17 years of age, while on an errand to buy groceries for her grandmother, consented to accompany defendant behind a store and engage in sexual relations on the concrete steps of a loading area—and thereafter promptly reported the incident to the police—was not worthy of belief by any standard. The allegations of Rhonda A., whose vehicle defendant commandeered, and Tambria R., who fled her own

The purpose of the trial was not to determine whether defendant committed the uncharged conduct. The sole issue the jury was called upon to decide was whether, as of the date of the trial, defendant had a mental disorder that made it likely he would engage in sexually violent criminal behavior. (Former § 6600, subd. (a)(1).) Therefore, we consider whether any doubt concerning these three uncharged incidents could have affected the jury's finding that defendant had a mental disorder in November 2005 that made it likely he would engage in sexually violent criminal behavior.

The evidence in support of the verdict consisted of the testimony of three experts—Drs. Owens, Sreenivasan, and Rowland. All three concluded that defendant suffers from various mental disorders that render him incapable of controlling his violent sexual urges. Owens and Sreenivasan based their conclusions upon defendant's conduct over a period of approximately 24 years, beginning with his juvenile record and continuing through his commitments to prison, jail, and Atascadero. The three uncharged incidents in the latter half of 1989 were merely a small part of the extensive data upon which the experts relied. Defendant did not propose to dispute the balance of his lengthy criminal history, nor did he suggest he would deny engaging in the behavior documented during his confinement in various institutions. Moreover, the uncharged conduct was similar to subsequent conduct established in connection with the predicate offenses, and this uncharged conduct was distant in time and therefore less probative of defendant's current inclination to engage in sexually violent behavior. (See *Hubbart, supra,* 19 Cal.4th at p. 1145 ["prior crimes play a limited role in the [sexually violent predator] determination"; a currently diagnosed mental disorder is necessary to adjudicate an individual a sexually violent predator].) Finally, Rowland's testimony was based upon defendant's conduct at Atascadero, and the expert's conclusions did not depend upon the uncharged conduct. In these circumstances, no reasonable juror could have concluded that the proffered testimony would have altered the experts' opinions concerning defendant's current status, and no reasonable juror could have rejected the experts' opinions concerning defendant's current status based upon any doubt with respect to the nature of the uncharged conduct that had occurred 16 years earlier. Therefore, the jury's verdict would not have been affected by defendant's testimony that Rhonda A., Tambria R., and Melanie H. consented to his conduct.

Second, defendant sought to testify that he had been willing to take medication "except for some further and subsequent understanding regarding the side effects." He did *not* offer to testify that he *was* taking medication,

---

apartment and hysterically reported defendant's conduct to a neighbor, also exhibit indicia of truth—defendant's alleged conduct is similar to the predicate offenses and occurred close in time to the predicate offenses; the victims apparently did not know one another; the victims promptly reported the conduct to the police, and third parties witnessed the victims' escape.

and Dr. Rowland's testimony established that defendant had not taken medication following his transfer a year earlier to the county jail in conjunction with the proceeding to extend his commitment. Rowland's testimony also established that medication could assist defendant in organizing his thinking sufficiently to enable him to complete a hall pass and travel to a selected destination within the hospital, but that the medication required a trial period to evaluate its efficacy, and that neither defendant's several months of taking his first medication nor his subsequent "off and on" acceptance of medication constituted an adequate trial. Finally, both Rowland and Sreenivasan testified that defendant had not completed phase two of Atascadero's treatment program for sexual offenders (the phase in which he would learn about his distorted thought process) and thus was not yet prepared to begin changing the patterns of behavior that resulted from his mental distortions. Even if defendant had testified and promised to take any medication that might help him control his behavior, no reasonable juror could have concluded that defendant's promise established, contrary to the verdict the jury reached absent such evidence, that defendant no longer was a sexually violent predator.

Finally, defendant proposed to testify that female staff in prison and at Atascadero flirted with him. Even in the unlikely event a juror were to believe that female staff who complained of defendant's inappropriate sexual behavior were flirting with defendant, no reasonable juror could have reached a different verdict based upon such belief. At both institutions, defendant consistently was informed that his behavior was inappropriate; the alleged flirting could not have led him to believe it was appropriate to stalk staff, expose his penis, or touch female staff members or write them sexually explicit notes. Therefore, defendant's intended testimony would not have diminished the probative value of the experts' opinion that defendant was unable to control his sexual urges, or of the other evidence introduced by the prosecution. No reasonable juror could have concluded, based upon defendant's testimony that staff members flirted with him, that defendant was capable of controlling his behavior.

In sum, the proffered testimony that the uncharged conduct in 1989 was consensual, that defendant was willing to take his medication, and that staff members flirted with him could not, in the circumstances of this case, have had any impact upon the jury's conclusion that defendant is a sexually violent predator. Therefore, the error in prohibiting defendant from testifying over the objection of his counsel was harmless beyond a reasonable doubt.[21]

---

[21] It also follows, of course, that there is no reasonable probability that defendant would have achieved a more favorable result but for the erroneous denial of his right to testify. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## VI.

The judgment of the Court of Appeal is affirmed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.