Filed 12/10/13  P. v. R.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057108 |
| v. | (Super.Ct.No. FELSS1104808) |
| R.A., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Katrina West, Judge.  Affirmed.

Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Marilyn George and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant R.A. challenges the trial court's order continuing his involuntary treatment as a mentally disordered offender (MDO). He contends the trial was untimely, violating his due process right to a fair trial; he was not advised of his right to a trial by jury; and the evidence was insufficient to support the court's finding. We disagree and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

On October 20, 2011, the San Bernardino County District Attorney's office filed a petition for commitment as an MDO pursuant to Penal Code[1] section 2970 et. seq. (the Petition). The Petition alleged that defendant was presently a patient at Patton State Hospital (PSH), was born in 1961, and his maximum commitment date was February 25, 2012. Attached to the Petition were the declaration of Deputy District Attorney Diane M. Harrison, the recommendation of PSH Medical Director George Christison, M.D., and the evaluation of Ai-Li Arias, M.D. Ms. Harrison declared that, based upon her review of the evaluation and recommendation, defendant "has a severe mental disorder," not in remission, which caused him to represent a "substantial danger of physical harm to others." The nature of the "severe mental disorder" was not specified. However, defendant was described as exhibiting such symptoms as agitation, paranoia, and poor insight.

In her evaluation attached to the Petition, Dr. Arias summarized defendant's history, noting his initial commitment on November 15, 1993, pursuant to section 1026,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

following charges that he had threatened to "torch" his family's home. (§ 422.) Defendant was conditionally released on August 15, 1995; however, his release was revoked approximately one year later for using methamphetamine, being absent without leave, failing to make a scheduled appointment with his clinician, and making threats against his mother. He was again released in May 1998, but his return to abusing illicit substances and an attack on a deputy sheriff led to his being hospitalized at PSH in August 2000. On March 1, 2001, defendant was convicted of assault with a deadly weapon and resisting an officer, for which he was sentenced to three years in state prison. After five months, defendant was transferred to PSH, where he stayed until November 4, 2002, when he was discharged to outpatient treatment. He resumed his work as a pipe fitter, living with his parents until 2004, when he committed and was convicted of violating section 368, subdivision (b)(1). Upon learning that he was to return to a mental health facility, it was reported that defendant threw a computer into the fireplace and struck both of his parents. On January 3, 2008, defendant was transferred from prison to Atascadero State Hospital (ASH) pursuant to section 2684, subdivision (a), for acute depressive symptoms and self-destructive impulses. Eight months later, he was found to meet the criteria for treatment by the Department of Mental Health as a condition of parole. On January 22, 2009, the San Luis Obispo County Superior Court decertified defendant as an MDO and ordered him released.[2] He was discharged from ASH on

---

[2] Defendant requests augmentation of the record to include documentation from the San Luis Obispo County Superior Court regarding its order decertifying him as an

*[footnote continued on next page]*

3

January 27, 2009. However, effective February 24, 2009, defendant's parole was suspended and he was returned to prison. On March 11, he was reinstated on parole. On June 24, 2009, defendant's mother reported that he had called her and "seemed incoherent." He was arrested and charged with violating a condition of parole that prohibited contact with any victims, including his mother. Parole was revoked on July 22, 2009, and he was re-admitted to ASH on November 30 following his recertification as an MDO. His controlling discharge date was set for February 25, 2012.

On October 28, 2011, counsel was appointed to represent defendant. On December 13, 2011, the parties stipulated and the court ordered the release of relevant records from the California Department of Corrections and Rehabilitation, including defendant's mental health and medical records, to both parties. Multiple hearings were scheduled, continued, and rescheduled over a period of 10 months. Defendant was not present at any of these hearings, including the one when his counsel waived his right to trial prior to his discharge date of February 25, 2012. Because of the delays, on August 2, 2012, the medical director at PSH submitted a request for another petition for continued involuntary treatment through February 25, 2014. Attached to the request was a report by Dr. Steven Berman, a psychologist, who observed that defendant "has a severe mental disorder" that is not in remission. Again, the nature of the "severe mental

*[footnote continued from previous page]*

MDO. The People oppose the request. We grant it and order the record augmented with the four pages attached to the request.

4

disorder" was not disclosed; however, defendant's symptoms included agitation, paranoia, poor insight, social withdrawal, and affective volatility.

On August 29, 2012, trial on the Petition commenced. Defense counsel moved to dismiss the Petition based on the fact that defendant was not personally notified or brought to court within the statutory time limits of section 2970, and that he was denied his due process rights. The motion was denied. The following evidence was presented to the trial court: Defendant testified that he was 50 years old and being housed at PSH. He admitted that he had a mental illness and was diagnosed with Schizo-Affective Disorder, and depression; however, he insisted that his disorder was all due to substance abuse, i.e., when he does not use drugs or abuse alcohol, he does not have psychotic symptoms. He described past crimes dating back to when he was 16. He also admitted punching his mother, who was 66, and his father, who was 70, throwing their computer into the fireplace, and running naked into the woods. This occurred after he drank too much beer, too many energy drinks, and Claritin medication. He claimed that most of his violence occurred when he was under the influence of controlled substances, and when he is sober he does not have violent outbursts.

Dr. Arias opined that defendant suffers from a severe mental disorder "described in the psychotic spectrum." "He has a lot of psychotic symptoms including auditory hallucinations, delusions that have religious, persecutory, grandiose, and bizarre themes in the past. He also has a lot of anxiety, a lot of paranoia about other people in general, including patients and staff. [¶] He has also shown a lot of mood volatility in that he'll

5

be calm and blow up for no reason if requested to do something simple like hold up his arm for blood pressure." According to Dr. Arias, defendant has a delusional belief that he is not an MDO, despite having been recertified as such in November 2009. In spring 2012, defendant threatened to kill his psychiatrist. In May 2012, he yelled at staff for perceived threats to himself. He thought the hospital staff was trying to kill him. Dr. Arias described defendant as being "quite psychiatrically unstable" and not in remission, as evidenced by recent episodes of agitation, verbal abuse towards staff for denying his requests, and threats to his psychiatrist.

Dr. Arias's report noted that defendant's criminal history included arrests and/or convictions for receiving stolen property, battery, showing false identification to a peace officer, criminal contempt, petty theft, grand theft auto, assault with a deadly weapon, spousal abuse, trespassing, vandalism, threatening crime with intent to terrorize, and injury to an elder person likely to cause great bodily injury or death. He failed multiple times to comply with parole and other conditional releases. In the months before the hearing, defendant's symptoms had quieted; however, he remained psychiatrically unstable. Dr. Arias testified that defendant does not follow his treatment plans because he fails to participate meaningfully in group therapy, continues to attempt to obtain Sudafed in order to get high, and he has a history of hoarding pills so that he can later crush and snort them to achieve a high. Defendant was diagnosed with Schizo-Affective Disorder. The doctor opined that in an unsupervised setting, where multiple stressors could exacerbate his symptoms, defendant would be unable to control his disorder

6

because he was unlikely to use his medications appropriately given his poor insight into his mental illness.

According to Dr. Arias, while defendant understands that using illegal substances and drinking alcohol will exacerbate his mental disorder, "he perseverates in his denial that he actually has a primary psychotic disorder [which] prevents him from understanding the gravity of the situation, and that he must stay away from abusing even legal medications that are used typically for colds and allergies." Given the actions that led to his last arrest, Dr. Arias opined that defendant represents a substantial danger of physical harm to others. Dr. Arias further reported that prior to the underlying offense, defendant was talking with God all day, drank a six-pack of beer combined with Red Bull, and took more than two days' worth of Claritin. The resulting intoxication "exacerbated his Schizo-Affective Disorder," causing him to become violent, punch both of his parents in the face, ransack their house, and set it on fire. When the police arrived, defendant was "running around in the forest naked behind his parent[s'] residence," yelling incoherently "something about they are killing his babies." He also had delusions that he was born in 1960 instead of 1961, and was kept in a freezer for one year; grandiose delusions that he was Richard the Lionhearted; and delusions that his cell mates killed people and ate their body parts.

Dr. Arias noted that at one point, a psychopharmacology consultant diagnosed defendant as having "Substance Induced Psychotic Disorder." Once the underlying psychotic disorder emerged, it did not go away; rather, it persisted without substance use.

7

The doctor was aware of studies that showed some effects of chronic use of methamphetamine can cause lifetime mental illness; however, she noted that defendant tends to improve when on a therapeutic dose of antipsychotic medication. Defendant had recently agreed to take Abilify, an antipsychotic medication; however, previously he "only wanted to take an anti-depressant because he's firm in his belief that his only problem is depression for being hospitalized at [PSH]." Dr. Arias opined that defendant was not in remission, because he continued to have "a lot of underlying paranoia, mood volatility, delusional beliefs, and very poor insight," and he posed a substantial danger of physical harm to others because he "continues to have ongoing symptoms of a severe mental disorder, which impairs his . . . perception of reality, and leads to poor judgment and behavior." The doctor added that historically when defendant decompensated and had active symptoms of his severe mental disorder, he became impulsive and aggressive and caused injury to others.

At the close of the hearing, the trial court observed that defendant had improved since he had been on the antipsychotic medication; however, the court found that defendant continues to suffer from a severe mental disorder that is not in remission and cannot be kept in remission without continued treatment. The court concluded that because of his severe mental disorder, defendant represents a substantial danger of physical harm to others, and thus, it extended his commitment to February 25, 2013, or until further order of the court. Defendant appeals.

## II. DUE PROCESS RIGHTS

Defendant begins by arguing that his fundamental due process rights were violated in these proceedings.

### A. Right to Speedy Trial

Defendant faults both the trial court and his counsel for failing to advise him of his right to a speedy trial. Moreover, he claims the trial court erred in denying his motion to dismiss for lack of a speedy trial.

Recognizing that MDO proceedings are civil in nature, defendant bases his claim not on the Sixth Amendment's speedy trial guarantee, but on statutory law and the constitutional right to due process. (See generally *People v. Williams* (2003) 110 Cal.App.4th 1577, 1590 ["MDO commitment proceedings are civil in nature and therefore defendants presented with possible commitment do not enjoy the constitutional rights accorded criminal defendants"].) By statute, a hearing on a petition to extend an MDO's commitment should be held at least 30 days prior to his or her scheduled release date. (§ 2972, subd. (a).) However, "th[is] 30-day trial deadline . . . 'is directory and not mandatory,' and 'is primarily designed to serve the interests of the *public*, rather than the MDO, by providing reasonable assurance that an MDO . . . will not be released unless and until a determination is made that he or she does not pose a substantial danger to others.' [Citation.] A trial commenced less than 30 days before an MDO's scheduled release date is not automatically invalid, nor does the trial court lose jurisdiction if trial

9

commences after the deadline has passed." (*People v. Noble* (2002) 100 Cal.App.4th 184, 188, quoting *People v. Williams* (1999) 77 Cal.App.4th 436, 451, 454.)

It does not appear that defendant is arguing that the continuances of the trial prejudiced him. On this record, they did not. Nonetheless, defendant claims that the failure "to bring the matter to trial within the maximum time allowed was error." Even if we assume that error exists, defendant has not explained how he was prejudiced by this error, other than to claim "[a]n extensive delay should be presumed prejudicial." The fact that section 2972, subdivision (a), is directory rather than mandatory means that the delay in bringing the matter to trial is not reversible error in the absence of prejudice. (Cal. Const., art. VI, § 13; see *People v. Williams*, *supra*, 77 Cal.App.4th at pp. 446-447.) Having failed to show prejudice, his claim must fail and the assumed error is not reversible.

**B.  Right to a Jury Trial**

*1.  Waiver by counsel*

Defendant acknowledges this court has previously held that an attorney may waive the client's right to a jury trial in MDO and other civil commitment proceedings. (See *People v. Montoya* (2001) 86 Cal.App.4th 825, 830 [Fourth Dist., Div. Two] (*Montoya*).) However, he argues that the case is distinguishable and asks us to reconsider our holding. Citing *People v. Allen* (2008) 44 Cal.4th 843, he insists that even though the right to a jury trial granted in civil commitment proceedings is statutory, the potential for deprivation of liberty implicates his constitutional due process rights.

10

An MDO proceeding is a special proceeding of a civil, rather than a criminal, nature. (*People v. Fisher* (2009) 172 Cal.App.4th 1006, 1013.) It does not implicate all of the constitutional and procedural safeguards afforded to criminal defendants. (*People v. Beeson* (2002) 99 Cal.App.4th 1393, 1407 [Fourth Dist., Div. Two].) "Generally in civil cases, an attorney has 'complete charge and supervision' to waive a jury. [Citations.]" (*People v. Otis* (1999) 70 Cal.App.4th 1174, 1176 (*Otis*).) In *Otis*, the court specifically held that section 2966, subdivision (b) does not require personal waiver by the defendant. That subdivision (b) states in part: "The trial shall be by jury unless waived by both the person and the district attorney." (§ 2966, subd. (b).) However, "nothing in the requirement that the waiver must be by 'the person' precludes the person's attorney from acting on his behalf. The Legislature did not say the waiver had to be made 'personally.'" (*Otis*, *supra*, at p. 1176.) "Section 2966 concerns persons who have been found by the Board of Prison Terms to be mentally disordered. The Legislature must have contemplated that many persons, such as Otis, might not be sufficiently competent to determine their own best interests. There is no reason to believe the Legislature intended to leave the decision on whether trial should be before the court or a jury in the hands of such a person. That the Legislature specified a waiver of time could be by the petitioner 'or his or her counsel' does not lead us to conclude in the context of this statute that the petitioner must personally waive a jury." (*Id*. at p. 1177.) We continue to agree with the analysis in *Otis* and in this court's opinion in *People v. Montoya*, *supra*, 86 Cal.App.4th at pages 831-832.

11

Nonetheless, defendant asserts that our state's highest court has "acknowledged its reliance on a balancing of the four factors identified in *Morrissey v. Brewer* [(1972)] 408 U.S. 471, to determine what due process is required. (*Allen*, *supra*, 44 Cal.4th at pp. 862-870.)" Thus, he claims that a "new assessment of the situation presented in *Montoya*" is required. The relevant factors identified in *People v. Allen*, are: "'(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (4) the dignitary interest in informing the individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official. [Citation.]' [Citation.]" (*People v. Allen*, *supra,* 44 Cal.4th at pp. 862-863, fn. omitted; see also *People v. Otto* (2001) 26 Cal.4th 200, 210.) However, defendant makes no attempt to balance the applicable factors. The first factor (the individual's liberty interest) weighs in favor of affording all reasonable procedures to guard against erroneous deprivation of liberty interests. "[T]he fact that the interests involved in involuntary commitment proceedings are fundamental enough to require a jury trial does not lead ineluctably to the conclusion that the waiver of a jury trial in such proceedings must be personal as in criminal prosecutions." (*People v. Rowell* (2005) 133 Cal.App.4th 447, 454.) The second (the risk of erroneous deprivation of the private interest and the value of substitute

procedural safeguards) and third (governmental interests) factors weigh in favor of vesting the waiver of jury trial with the attorney rather than allowing the defendant to overrule the attorney's tactical decision. The fourth factor (the dignity interests of a person subject to involuntary commitment) also does not weigh in favor of allowing the individual to overrule counsel's decision to waive a jury trial. The dignity interests of being informed of the nature, grounds, and consequences of the action (MDO commitment), and in enabling the defendant to present his or her side of the story are not affected by permitting counsel to waive the defendant's jury trial right.

Regarding this court's "discussion of the courts' presumptions about the abilities of various defendants," we decline the invitation to proliferate meta-proceedings, or trials-within-trials, on the nuances or levels of defendant's mental capacities. As we stated in *Montoya*, "Although it is certainly conceivable, as defendant suggests, that a patient might be mentally disordered for some purposes and not for others, it is particularly difficult to sort those categories out in a case of schizophrenia, as all of the doctors testified." (*Montoya*, *supra*, 86 Cal.App.4th at p. 831.) Neither do we mean to single out schizophrenia. "For whatever reasons (drug damage, inherited characteristics, other mental illnesses), defendant's mind, as even his attorney admitted, did not function normally." (*Ibid.*) Defendant has long suffered from poor judgment and aberrant and dangerous behavior: he has already numerous times been adjudged an MDO who is not in remission. As in *Montoya*, "there was no reason to believe that defendant was capable

of making a reasoned decision about the relative benefits of a civil jury trial compared to a civil bench trial," (*ibid.,* fn. omitted) regardless of state of mind.

In *People v. Cobb* (2010) 48 Cal.4th 243 (*Cobb*), the Supreme Court held that because the time limits in the MDO statute, section 2960 et seq. are not jurisdictional, when, without good cause or a time waiver, a trial to extend a defendant's one-year commitment under that statute does not begin before the defendant's scheduled release date, the defendant may be entitled to release pending trial. (*Cobb*, *supra*, 48 Cal.4th at p. 252.) However, no other relief is available to the defendant when the statutory time limits for filing an extension petition or for commencing trial on that petition are violated. (*Id*. at p. 253.) No remedial action need be taken if the defendant suffered no prejudicial harm. (*People v. Lara* (2010) 48 Cal.4th 216, 235-236.) As previously noted, defendant has not suggested any actual harm to himself other than the length of the delay and the failure to allow defendant to exercise his right to a jury trial. However, according to the record before this court, the proceedings were fundamentally fair. Absent evidence to the contrary, no remedial action is necessary.

An MDO defendant does have legitimate due process interests in the fairness of the proceedings. However, it is fully consistent with due process in such special civil proceedings to permit counsel to waive a jury trial, regardless of the defendant's personal objection.

14

### *2. Failure to advise of right*

Pursuant to section 2972, subdivision (a), the trial court was required to advise defendant of his right to a jury trial. The statutory language is couched in mandatory terms. The record does not affirmatively show that the trial court fulfilled this duty; nothing in the record indicates the trial court or counsel gave the mandatory jury trial advisement. Nonetheless, the record shows that defense counsel waived such right on behalf of defendant. Because the right to a jury trial in MDO proceedings is granted by statute, we review any violation under the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Wrentmore* (2011) 196 Cal.App.4th 921, 928-929 and *People v. Cosgrove* (2002) 100 Cal.App.4th 1266, 1275-1276 [Fourth Dist., Div. Two] [wrongly denying a jury trial to an MDO was held harmless under *Watson*].) Under that standard, it is not reasonably probable that defendant would have achieved a more favorable result in the absence of the error. Even if the trial court had properly advised defendant of his statutory right to a jury trial, defendant's attorney could have waived that right, even over defendant's objection.

### III. SUFFICIENCY OF EVIDENCE

Defendant contends the trial court erred in finding he should remain committed as an MDO because there was insufficient evidence that the mental disorder that caused or was an aggravating factor in the predicate offense was the same as that for which he had been treated and which the People's expert claimed was not in remission.

Under the MDO Act, "[a]s a condition of parole, a prisoner may be designated and civilly committed as an MDO for involuntary treatment of a 'severe mental disorder' if certain conditions are met. [Citations.]" (*People v. Allen* (2007) 42 Cal.4th 91, 99, fn. omitted.) Once an initial MDO commitment is established, before that period expires, "the district attorney may petition to extend that commitment by one year. [Citation.]" (*Ibid.*) If it is extended, "the district attorney may file subsequent petitions to [further] extend the MDO's commitment in one-year increments. [Citations.]" (*Id.* at p. 100.)

In order to extend an MDO's commitment by one year, "the medical director of the state hospital, the community program director, or the Director of Corrections first 'shall submit' to the district attorney a written evaluation of the prisoner '[n]ot later than 180 days' before the prisoner's termination of parole or release, 'unless good cause is shown' for delay. [Citation.] If the district attorney files a petition for continued involuntary treatment for one year [citation], the trial court will hold a hearing on the petition, and the trial 'shall commence no later than 30 calendar days' before the time the prisoner would have been released, 'unless the time is waived by the person or unless good cause is shown.' [Citation.]" (*People v. Allen, supra*, 42 Cal.4th at p. 99.)

At the MDO recommitment hearing, the People must prove beyond a reasonable doubt that: (1) the parolee continued to have a severe mental disorder; (2) the mental disorder was not in remission or could not be kept in remission without treatment; and (3) by reason of the mental disorder, the parolee continued to represent a substantial danger

16

of physical harm to others.  (§§ 2962, subds. (a) & (d)(1), 2972, subd. (e); *People v. Superior Court* (*Myers*) (1996) 50 Cal.App.4th 826, 837.)

The same standard of review used in determining a claim of insufficiency of the evidence in a criminal case applies to appellate review of mentally disordered offender proceedings.  (*People v. Miller* (1994) 25 Cal.App.4th 913, 919-920.)  "We consider the entire record in the light most favorable to the judgment and must affirm if there is any substantial evidence supporting the finding.  [Citations.]"  (*People v. Valdez* (2001) 89 Cal.App.4th 1013, 1016.)  A single opinion by a psychiatric expert that the defendant is currently dangerous due to a mental disorder can constitute substantial evidence to support the extension of a commitment.  (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165.)

An expert may generally base his or her opinion on any "matter," personally known or made known to him, whether or not admissible, "that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ."  (Evid. Code, § 801, subd. (b).)  "Psychiatrists, like other expert witnesses, are entitled to rely upon reliable hearsay, including the statements of the patient and other treating professionals, in forming their opinion concerning a patient's mental state.  [Citations.]  On direct examination, the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion.  [Citation.]"  (*People v. Campos* (1995) 32 Cal.App.4th 304, 307-308.)

17

Defendant first notes the Petition failed to identify the specific mental disorder at issue. However, he does not argue that such failing has prejudiced him. Rather, he attacks the trial court's ruling, claiming that it "did not clearly indicate it found the mental illness ongoing and not in remission." (Underlining in original.) Citing *People v. Garcia* (2005) 127 Cal.App.4th 558, pages 565 through 567 [Fourth Dist., Div. Two] (the People sought an MDO extension with evidence of a new mental disorder different from the one which defendant had been receiving treatment and had been declared to be in remission), defendant argues the People failed to produce substantial evidence of the identity of the mental disorder. The People agree that "the medical and procedural history in this matter was not set forth as straight-forwardly as one would like." However, they argue that "a rational fact-finder could and did find that [defendant] was tormented by a continuing severe psychotic mental disorder, and that his Schizo-Affective Disorder caused or was an aggravating factor in his physical abuse of his parents, and that he remained a danger to the public." We agree with the People.

Only two people testified at the hearing: defendant and Dr. Arias. During defendant's testimony, defendant stated that his psychosis is mostly drug induced and his violent behavior and delusions occur when he is under the influence of substances. He agreed he had a mental illness; however, he opined it was related to his drug use. He pointed out specific incidents involving criminal behavior and explained they were related to his drinking alcohol or taking illegal substances. He attributed his depression

18

to being hospitalized.  Overall, he did not believe he fit the criteria for MDO commitment because he has a drug problem rather than a mental illness.

Both witnesses noted defendant's extensive criminal record, which included arrests and/or convictions for receiving stolen property, battery, criminal contempt, petty theft, grand theft auto, assault with a deadly weapon, spousal abuse, trespassing, vandalism, threatening a crime with intent to terrorize, and injury to an elder person likely to cause great bodily injury or death.  In addition, while committed as an MDO, defendant threatened to kill his psychiatrist and yelled at staff for perceived threats to himself.  According to Dr. Arias, defendant's history of violent crime posed a severe danger to others.  He had suffered from a severe mental disorder for many years.  His psychosis included breaks from reality, auditory hallucinations and delusions with religious, persecutory, grandiose, and bizarre themes.  During the year prior to the hearing, defendant's moods were volatile.  He reacted negatively and aggressively in response to perceived fear when there was no actual danger present.  Although defendant was taking medication, Dr. Arias believed he continued to remain threatening and unpredictably volatile in unexpected situations.  She opined that defendant remained a danger because of his belief that he does not have a mental illness or a substance abuse problem, does not need antipsychotic medications, and continues to seek any drugs with a stimulant effect.

In contrast to the facts in *People v. Garcia*, *supra*, 127 Cal.App.4th 558, here the People presented documentation from PSH that defendant had a severe mental disorder

19

(initiating his commitment in 1993) for which he was continuously treated, with the exception of the period between January and November 2009 when he was decertified as an MDO. The documents described the continuing symptoms defendant exhibited over the years since his elder abuse offense in 2004, and continuing through the time of the filing of the Petition. These symptoms were consistent with his diagnosis of Schizo-Affective Disorder. Dr. Arias's testimony constituted overwhelming evidence to support a finding that defendant posed an unreasonable risk of harm to others due to his mental disorder, specifically, Schizo-Affective Disorder. Defendant failed to present an expert to testify that he was not currently dangerous. Nor did he present evidence that contradicted or impeached Dr. Arias, or suggested her testimony was merely speculative. Rather, he testified as a witness for the People and conveyed his own opinion that he did not suffer from a mental illness, but a drug problem.

Ultimately, the evidence supporting defendant's extended MDO commitment consisted entirely of the testimony of the expert witness, whom the court found to be credible. We must accord due deference to the court's evaluation of credibility. (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083 [Fourth Dist., Div. Two].) Thus, viewing the evidence in the light most favorable to the People, we conclude that there was more than enough evidence to support the extension of defendant's commitment.

IV. DEFENDANT'S STATUS SINCE 2009

Defendant contends the evidence presented at the hearing focused on events and conditions prior to the January 2009 trial, at which defendant was found to be in

20

remission and not a danger to society. He faults the People for failing to offer information of his behavior post-2009. Basically, defendant claims that the single finding in January 2009 that he was not an MDO was insufficiently rebutted at this hearing, and the judgment should be reversed. We disagree.

According to the record before this court, there were significant current conditions "materially" different from those in 2009 to support the finding that defendant fit the description of an MDO. Dr. Arias's report noted that in June 2009, defendant called his mother and was "'rambling and seemed incoherent and was located in a cave in San Diego.'" In July 2009, defendant was admitted to a "Mental Health Care Bed . . . for suicidal ideation." He was deemed a "'danger to himself and others' for 'banging his head against the wall.'" While incarcerated at the Correctional Treatment Center in September 2009, defendant assaulted his cell mate for allegedly "'badmouthing his girlfriend.'" On November 29, 2009, defendant was again found to be an MDO. In August 2010, defendant "charged at the Unit Supervisor" at Atascadero. Less than one month later, he was "'involved in an aggressive act toward [a] peer'" and placed in seclusion. When the treating psychiatrist confronted him about possessing contraband, defendant "'became enraged (violent posturing to hit) and threatening to his psychiatrist ("I will kill that bitch").'" Defendant refused to take his medications; however, he would hoard certain medications for the purpose of crushing and "snorting" them in an attempt to get high. While committed at ASH, defendant refused to attend group therapy. While he did attend group therapy at PSH, he refused to participate in a "30-day Social Work

21

Assessment" for June 2011. Dr. Arias noted that defendant exhibited signs and symptoms of his severe mental disorder, was physically violent towards others, threatened others, and refused to follow his treatment plan. She testified to the above at the hearing.

On June 14, 2012, a second report was completed by Dr. Anca Chiritescu, M.D., and senior supervising psychologist, Steven Berman. Although it incorporated much from the earlier report, it did add a notation that defendant had, according to records, "experienced symptoms of his severe mental disorder in the absence of substance intoxication or withdrawal and that these symptoms are not due to the direct physiological effects of a general medical condition." It was noted that defendant "has been rendered a diagnosis of Amphetamine induced psychosis in the past," but that the present evaluators felt further psychological testing should be conducted in light of "his continued Axis I symptoms." The nature of the "severe mental disorder" was not specified or identified; however, defendant's signs and symptoms included "agitation, paranoia, poor insight, social withdrawal, and affective volatility."

According to the report, defendant exhibited displays of verbal anger and was seen muttering to himself that the "'meds are no good'" and the doctor was "'against'" him. Delusions were identified based on defendant's expressed belief that he did not have a mental illness beyond depression and that his commitment was illegal. Defendant was reportedly "becoming more psychiatrically stable on his current psychotropic

22

medications," but the doctors were cautious given his earlier behavior and statements, refusal of medication, and failure to attend groups at ASH.

Defendant failed to acknowledge his severe mental disorder. He claimed that his actions were the result of his drug use, pointing out that a psychopharmacology consultant had previously diagnosed him as having Substance Induced Psychotic Disorder. Again, the doctors had noted this diagnosis; however, they opined that once the underlying psychotic disorder emerged, it did not go away; rather, it persisted without substance use.

Given the above, the evidence was more than sufficient to show that defendant's mental condition had materially changed since January 2009. Defendant suffered a severe mental disorder (Schizo-Affective Disorder) which was not in remission or capable of being kept in remission, which caused him to be a physical danger to the public, and which he had been treated for at least 90 days in the prior year.

V. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
J.

We concur:

RAMIREZ
P.J.

MCKINSTER
J.

23