Filed 1/22/16  P. v. Asher CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050231 |
| v. | (Super. Ct. No. FVAFS020545) |
| JOHN ASHER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of San Bernardino County, James M. Dorr, Judge.  (Retired Judge of the San Bernardino Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Remanded for further proceedings.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Randy Einhorn and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant John Asher was committed to a mental hospital after a jury found he was a sexually violent predator (SVP). He claims the state's commitment petition was untimely, evidentiary error tainted his trial and the Legislature's failure to accord SVP's their constitutional right against self-incrimination violates equal protection. While we reject appellant's timeliness and evidentiary arguments, his equal protection claim may have merit. We remand the matter for an evidentiary hearing on that issue.

FACTS

Appellant has a long history of sexual misconduct. In 1976, when he was 16 years old, he spent time in juvenile hall for fondling a 12-year-old girl. Two years later, he moved in with a 16-year-old girl and got her pregnant. They were married for a couple of years but separated due to mutual infidelity. The nature of the infidelity is not revealed in the record, but while appellant was married to his second wife in the early 1980's, he had sexual relations with a 15-year-old girl who lived in their neighborhood. Appellant was charged with raping the girl, but before trial he pleaded guilty to unlawful sexual intercourse and was given probation. It was around this time that appellant started using methamphetamine on a regular basis.

In 1987, at the age of 26, appellant was accused of molesting three girls, including a toddler of 19 months. He was also convicted of committing a lewd act against eight-year-old Jill C. After spending a year in jail for that offense, he was placed on five years' probation.

While on probation, appellant became involved with a woman named L.C., who had two daughters, age 14 and 3. One day, L.C. caught appellant orally copulating the three-year-old in the living room. When she asked appellant what he was doing, he said, "I don't know. I can't handle it. I can't stop." Appellant also tried to molest the older daughter on multiple occasions. And he was accused of inappropriately touching his niece when she was nine years old. His probation was revoked and he was sent to prison for three years.

2

Released in 1995, appellant met Misty F. and promptly began molesting her six-year-old daughter A. Appellant not only forced A. to orally copulate him on numerous occasions, he digitally penetrated her whenever they were alone. The molestation lasted about two years before appellant was arrested, convicted of lewd conduct with a minor and sentenced to six years in prison. Appellant was scheduled to be released on September 3, 2003, but his incarceration was extended eight days to allow the state to file a petition to have him committed as a SVP. He was then transferred to a state mental hospital pending trial, which commenced in 2013.

At trial, the prosecution called appellant as a witness, and he testified at length about his relationship with the victims and his alleged sexual misconduct. While disputing some of the allegations and downplaying others, he admitted molesting some of the victims and getting sexually aroused in the process, although he insisted he "never had sexual urges for children." He surmised some of his misconduct stemmed from anger and frustration, and he apologized for any harm he caused his victims.

State psychologists Douglas Korpi and Jack Vognsen testified they evaluated appellant before trial to determine whether he meets the criteria for commitment as an SVP. Korpi diagnosed appellant with pedophilia and amphetamine dependency, and Vognsen believes he suffers from paraphilia, not otherwise specified. They both opined appellant is a danger to the public and would likely reoffend if he were released into the community.

Defense experts Christopher Fisher and Mary Adams had a different take on appellant. They felt his problems stemmed mostly from substance abuse, and because appellant was sober and well behaved during his pretrial confinement, they did not believe he was likely to reoffend. The jury disagreed. They decided appellant was an SVP, and the trial court committed him to a state mental hospital for an indeterminate term.

3

DISCUSSION

*Timeliness of Commitment Petition*

Appellant argues reversal is required because the state's petition to have him committed was not filed until eight days after he was originally scheduled to be released from prison. We disagree. Although appellant was not in lawful custody when the petition was filed, the record shows this was due to a good faith mistake of law. Therefore, reversal is not required.[1]

Under the Sexually Violent Predators Act (SVPA), inmates who demonstrate a proclivity toward sexually violent behavior may be involuntarily committed to a mental hospital following the completion of their prison term. (Welf. & Inst. Code, §§ 6600 et seq.)[2] To justify a commitment, the state must show: 1) the inmate has been convicted of a sexually violent offense against one or more victims; 2) he has a diagnosed mental disorder; and 3) because of that disorder, he would likely engage in sexually violent criminal behavior if released. (§ 6600, subd. (a)(1); *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1142-1144.)

The statutory and regulatory framework governing the administrative commitment process is fairly complicated. As our Supreme Court explained in *In re Lucas* (2012) 53 Cal.4th 839 (*Lucas*), "The process begins when the Secretary of the Department of Corrections and Rehabilitation (DCR) determines that a person in custody because of a determinate prison sentence or parole revocation *may* be a sexually violent predator. If such an initial determination is made, the secretary refers the inmate for an evaluation. . . . (§ 6601, subd. (a)(1).)

"After the secretary's referral, the inmate is screened by the DCR and the Board [of Parole Hearings] to determine whether the person is *likely* to be an SVP. If the

---

[1] Appellant arguably forfeited his right to raise the timeliness issue on appeal by failing to raise it in the trial court. (See *People v. Williams* (1999) 77 Cal.App.4th 436.) However, we will consider the issue to foreclose the possibility of seeing it resurface in a petition for writ of habeas corpus. (*Id*. at p. 462.)

[2] Unless noted otherwise, all further statutory references are to the Welfare and Institutions Code.

4

DCR and the Board conclude that is the case, the inmate is referred for full evaluation by the State Department of Mental Health (DMH). (§ 6601, subd. (b).)

"A full evaluation is done by two practicing psychiatrists or psychologists, or by one of each profession. (§ 6601, subd. (d).) . . . A petition for commitment may not be requested unless the initial two evaluators . . . or . . . two independent evaluators . . . agree that the inmate meets the commitment criteria. (§ 6601, subds. (d)(f).)

"If, after the full evaluation is completed, the DMH concludes that the inmate is an SVP, the director of the DMH requests that a petition for commitment be filed by the district attorney or the county counsel of the county where the inmate was convicted. If upon review that official concurs, a petition for commitment is filed in the superior court. (§ 6601, subds. (h), (i).)" (*Lucas, supra*, 53 Cal.4th at pp. 845-846.)

In *Lucas*, the court emphasized that an SVP petition "must be filed while the inmate is in *lawful custody*." (*Lucas, supra*, 53 Cal.4th at p. 844, italics added.) While the period of lawful custody generally extends only up until the inmate's release date, section 6601.3 authorizes an inmate to be held for 45 days beyond that date if good cause is shown. (§ 6601.3, subd. (a).) In addition, California Code of Regulations, title 15, section 2600.1 (regulation 2600.1) authorizes the Board to issue a three-day hold when "there is not enough time before the inmate's release date for the Board to make the 'good cause' determination required for a 45-day hold." (*Lucas, supra*, 53 Cal.4th at p. 855; see Reg. 2600.1, subd. (a).) Regulation 2600.1 "is a safety valve that allows an extra three days when exceptional circumstances have precluded 'an earlier evaluation [of] the person pursuant to section 6601 . . . .'" (*Lucas, supra*, 53 Cal.4th at p. 855.)

Based on the foregoing, "It is apparent that the [administrative commitment] process has a number of steps and may take some considerable time to complete." (*Lucas, supra*, 53 Cal.4th at p. 846.) In fact, the complexity of the process has led the Legislature to address the issue of good faith compliance with the statutory requirements. Specifically, section 6601, subdivision (a)(2), provides, "A petition shall

5

not be dismissed on the basis of a later judicial or administrative determination that the individual's custody was unlawful, if the unlawful custody was the result of a good faith mistake of fact or law."

*Lucas* relied on this good faith provision in upholding the commitments at issue in that case. There, the Board obtained 45-day holds on a pair of inmates so they could undergo full psychological evaluations by the DMH. (*Lucas, supra*, 53 Cal.4th at pp. 846-848.) Although this resulted in the ensuing SVP petitions being filed after the inmates' scheduled release dates, the Board argued the delay was authorized by section 6601.3. As noted above, that provision allows for a 45-day hold upon a showing of good cause. However, at the time the petitions in *Lucas* were filed, in 2008, the statute did not define good cause. The statutory void was filled by regulation 2600.1, which defined good cause "in terms of the inmate's potential to satisfy the SVP criteria." (*Id*. at p. 844; see Reg. 2600.1, subd. (d).) In other words, the regulation justified a 45-day hold so long as there was probable cause to believe the inmate was a SVP. That was a problem, though, because it did not require the Board to explain *why* a delay was needed. Because the definition was unrelated "to the need for an extension beyond the scheduled release date" *Lucas* found that aspect of the regulation to be invalid. (*Ibid*.)[3]

Nonetheless, *Lucas* refused to blame the Board for failing to anticipate its holding. Even though the Board employed an erroneous standard of good cause in extending the inmates' custody, the court found dismissal unwarranted due to the lack of negligent or intentional wrongdoing. Because the Board had simply relied on the standard of good faith set forth in regulation 2600.1, which no previous judicial decision

---

[3] In 2010, section 6601.3 was amended to address this deficiency. As amended, that section states "good cause means circumstances where there is a recalculation of credits or a restoration of denied or lost credits, a resentencing by a court, the receipt of the prisoner into custody, or equivalent exigent circumstances which result in there being less than 45 days prior to the person's scheduled release date for the full evaluation described in subdivisions (c) to (i), inclusive, of [s]ection 6601." (§ 6601.3, subd. (b).)

had questioned, the court excused its actions as a good faith mistake of law. (*Lucas, supra*, 53 Cal.4th at pp. 852-858.)

In the present case, appellant was originally scheduled to be released from custody on September 3, 2003. However, following the DMH's evaluation of appellant in August of that year, the Board imposed a three-day hold on August 27.[4] Issued pursuant to regulation 2600.1, the hold was intended to apply from September 3 to September 8, to account for an intervening weekend. On September 8, the Board held a hearing and determined there was probable cause to believe appellant was a SVP. Therefore, it placed a 45-day hold on him under section 6601.3. As it turned out, the petition to have appellant committed was filed just three days later, on September 11, 2003.

Appellant contends his three-day hold and his 45-day hold were invalid, and therefore he was not in lawful custody when the state filed its petition to have him committed. He also contends the good faith rule invoked in *Lucas* is inapplicable in his case. As we now explain, appellant is right about the validity of his holds, but he is wrong about the good faith rule.

When this case arose in 2003, the requisite standard to obtain a three-day hold under regulation 2600.1 was probable cause. (See *Lucas, supra*, 53 Cal.4th at pp. 857-859.) As the *Lucas* court explained, that standard is deficient because it is geared toward the inmate's propensity for future sexual misconduct, as opposed to any actual need for the hold. "To allow the Board to place a . . . hold without a showing that more time is legitimately required to complete an evaluation would deny an inmate . . . important liberty interests, and undermine the balance among competing interests the Legislature sought to achieve." (*Id*. at p. 851.)

---

4    We grant appellant's request to judicially notice the administrative records reflecting how his case was handled. (Evid. Code, § 452, subd. (c); *Taiheiyo Cement U.S.A., Inc. v. Franchise Tax Bd.* (2012) 204 Cal.App.4th 254, 268, fn. 5.)

7

Therefore, the three-day hold placed on appellant pursuant to regulation 2600.1 on August 27, 2003 was invalid. And, for the same reason, so was the 45-day hold the Board issued under section 6601.3 on September 8, 2003. In fact, this aspect of the case falls squarely within the holding of the *Lucas* decision. (See *Lucas, supra*, 53 Cal.4th at pp. 849-852.) Consequently, appellant was not in lawful custody when the state petitioned to have him committed on September 11, 2003.

That brings us to the issue of good faith. In arguing lack of good faith, appellant points out that, unlike the situation in *Lucas*, where more time was needed for the inmates to undergo psychological evaluations by the DMH, his psychological evaluations were conducted by the DMH in August 2003, *before* the Board sought to extend his release date. While appellant recognizes a hold may have been needed to allow the district attorney additional time to evaluate his situation and determine whether to file a SVP petition against him, he insists the statutory framework does not contemplate an extension for this reason. However, both section 6601.3, the 45-day hold provision, and regulation 2600.1, the three-day hold provision, recognize a time extension may be required to conduct a "full evaluation pursuant to subdivisions (c) to (i)" of section 6601. (§ 6601.3, subd. (a); regulation 2600.1, subd. (a).) Because the authorization for review by the district attorney is set forth in subdivisions (h) and (i) of section 6601, and because such review is a necessary component of the evaluation process, it was not unreasonable for the Board to seek a time extension to facilitate such review. (See *Lucas, supra*, 53 Cal.4th at p. 840 [recognizing section 6601.3 was designed to permit an extension of confinement beyond the inmate's scheduled release date to "complete the evaluation required to support a commitment petition."]

Appellant also argues good faith is lacking because the declaration of the deputy district attorney who filed the commitment petition was signed on September 2, 2003. Appellant asserts, "There was no reason the district attorney could not have filed the petition on September 2 or 3," i.e., without seeking to extend his release date.

8

However, by that time, the three-day hold had already been issued, and it was soon followed up by the 45-day hold. Under these circumstances, the deputy district attorney had no reason to believe time was of the essence in terms of filing the petition. We cannot fault the deputy district attorney for relying on the Board's actions in deciding when to file the petition. Because she filed it before the 45-day hold expired, her actions were covered by the good faith exception. Thus, even though the petition was not filed until eight days after appellant was originally scheduled to be released, and he was not in lawful custody at that time, we find the Board's (and counsel's) reliance on the applicable statutes and regulations constituted an excusable good faith mistake of law. Therefore, the timing of the petition is not cause for reversal.

### *Victim Impact Evidence*

Appellant contends the trial court prejudicially erred in allowing the prosecution to elicit evidence regarding the impact his conduct had on his victims. Again, we disagree.

During the trial, there was evidence some of the victims have suffered severe anxiety as a result of the sexual abuse appellant subjected them to. Bedwetting, insomnia, nightmares, lack of trust and suicidal thoughts were also mentioned as consequences of the abuse. The trial court determined this evidence was relevant to the extent it may have affected appellant's decision-making process. For example, if appellant was aware of but dismissed the consequences of his predatory behavior, that would arguably make him a greater threat to reoffend. As it turned out, when appellant was asked at trial if he knew six-year-old A. was wetting the bed around the time he was molesting her, he said he knew of the problem but did not think it had anything to do with him.

Although it's a close call and we find it difficult to fault the trial court's resolution of it, we do not believe this was a proper area of inquiry. While appellant's awareness of the consequences of his behavior arguably had a bearing on his future

9

dangerousness, it is widely known that predatory sexual behavior is intrinsically harmful, and there was no evidence appellant was unaware of this fundamental truth. To the contrary, he implicitly acknowledged it at trial by apologizing for his behavior. Thus, the victim impact evidence did little to further the jury's understanding of the case. The emotionally-packed evidence was simply not sufficiently probative to justify the risk it entailed in terms of prejudicing or misleading the jury. (Evid. Code, § 352.)

Still, the erroneous admission of evidence does not require reversal unless it is reasonably probable the aggrieved party would have achieved a more favorable result had the subject evidence been excluded. (*People v. Richardson* (2008) 43 Cal.4th 959, 1001; *People v. Watson* (1956) 46 Cal.2d 818.) Here, the jury heard extensive and detailed evidence about the numerous sex crimes appellant committed against his victims, some of whom were very young. Given the graphic nature of this evidence, which was properly admitted, there was little danger the victim impact evidence had any effect on the jury's decision. Moreover, as the trial court properly recognized, no reasonable person would be surprised to hear appellant's victims suffered adverse psychological consequences as a result of what they were forced to endure. Thus, admission of the victim impact evidence is not cause for reversal. The evidence did not violate due process or render appellant's trial fundamentally unfair.

*Support Persons for Victim Witnesses*

Appellant also contends the court prejudicially erred by allowing some of the victims to testify with the aid of a support person. Here, we cannot fault the trial court at all.

All told, the jury heard testimony from six of appellant's victims. Over appellant's objection, two of the victims – Jill and A. – were accompanied at the witness stand by a support person. When the support person appeared for Jill, the trial court instructed the jury, "This witness has a support person that's sitting with her. The law

10

allows that and that is acceptable. They are not going to be communicating with each other in any way." No such instruction was given when A. testified.

Penal Code section 868.5, subdivision (a) provides, "Notwithstanding any other law, a prosecuting witness in a case involving . . . [child sex crimes] shall be entitled, for support, to the attendance of up to two persons of his or her own choosing, one of whom may be a witness, at the preliminary hearing and at the trial, or at a juvenile court proceeding, during the testimony of the prosecuting witness."

Seizing on the term "prosecuting witness," appellant argues this provision does not apply to SVP proceedings because they are civil in nature. Indeed, just because SVP "proceedings include many of the procedural protections afforded in criminal cases, . . . [that] 'does not transform [them] into a criminal prosecution.' [Citations.]" (*People v. Allen* (2008) 44 Cal.4th 843, 861.) On the other hand, SVP proceedings are certainly related to criminal matters, and no one would dispute the rationale for allowing support persons in criminal cases, which is to minimize the trauma to witnesses who have suffered sexual abuse (*People v. Kabonic* (1986) 177 Cal.App.3d 487, 495), applies equally in SVP trials. However, we need not decide whether Penal Code section 868.5 applies in SVP proceedings because any error in allowing Jill and A. to testify with the aid of a support person was harmless under any standard of review.

In arguing otherwise, appellant notes the trial court failed to make an express finding that Jill and A. actually needed a support person. However, it is doubtful such a finding was required because appellant was allowed to confront both of them face-to-face in the courtroom. (See *People v. Lord* (1994) 30 Cal.App.4th 1718, 1721-1722, distinguishing *Maryland v. Craig* (1990) 497 U.S. 836 and *Coy v. Iowa* (1988) 487 U.S. 1012, on that basis; accord, *People v. Johns* (1997) 56 Cal.App.4th 550, 553-556; but see *People v. Adams* (1993) 19 Cal.App.4th 412, which ruled the trial court must make an express finding of need whenever a witness support person is requested.)

11

Appellant also insists, "Seeing two victims with support persons, the jury could not help but feel that the judge was emphasizing both the current dangerousness of appellant and the ongoing adverse effects suffered by the victims due to appellant's past conduct." But this is pure speculation. There is nothing in the record to suggest the support persons' presence had any effect on the trial above and beyond that inherent in the statutory provision. And as our Supreme Court has pointed out, "[N]o decision supports the proposition that [appellant] advances here, that the support person's mere presence infringes his due process and confrontation clause rights." (*People v. Myles* (2012) 53 Cal.4th 1181, 1214.)

Moreover, the jury was instructed to base its decision solely on the evidence received at trial and not be swayed by sympathy or prejudice. (See CALCRIM No. 200.) Because "the record does not disclose any circumstances indicating that [Jill or A.'s] support person improperly influenced the jury's assessment of [their] testimony" (*People v. Myles, supra*, 53 Cal.4th at p. 1214), we reject appellant's claim of prejudice. (*Ibid.;* accord, *People v. Spence* (2012) 212 Cal.App.4th 478, 517-518.) He has failed to prove he was harmed by the support persons' presence at trial.[5]

*Appellant's Right Against Self-Incrimination*

That brings us to appellant's final claim. He asserts the SVPA violates equal protection because, unlike the commitment scheme for persons who are found not guilty by reason of insanity (NGI's), it does not afford prospective SVP committees all of the rights that are guaranteed in criminal trials. Consequently, when the prosecution called appellant to testify at trial, he did not assert his constitutional right against self-incrimination. We agree with appellant that this disparity in treatment between SVP's

---

[5]     Appellant has also failed to prove cumulative error compels reversal. The two evidentiary issues he raises – regarding the introduction of victim impact evidence and the allowance of support persons – constituted a very small part of a trial that lasted several weeks and that turned not on the credibility of appellant's victims but the persuasiveness of the parties' expert witnesses.

12

and NGI's may run afoul of equal protection principles. Therefore, we will remand the matter for further proceedings on this issue.

As we have noted, SVP proceedings are civil, not criminal, in nature. (*People v. Allen, supra*, 44 Cal.4th at p. 860.) Consequently, the Fifth Amendment right against self-incrimination does not, in and of itself, apply to such proceedings. (*Ibid*.) However, like any group of civil committees, SVP's do have the right to equal protection under the law. Indeed, "[d]ecisions by [the California Supreme Court] and the United States Supreme Court . . . have [long] used the equal protection clause to police civil commitment statutes to ensure that a particular group of civil committees is not unfairly or arbitrarily subjected to greater burdens. [Citations.]" (*People v. McKee* (2010) 47 Cal.4th 1172, 1199 (*McKee*).)

Although commitment proceedings are civil, the Legislature has determined NGI's "shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." (Pen. Code, § 1026.5, subd. (b)(7).) By virtue of this incorporation clause, NGI's have the right not to testify when the state seeks to have them committed beyond the maximum length of their underlying offense. (*Hudec v. Superior Court* (2015) 60 Cal.4th 815.) In contrast, the SVPA does not contain such an incorporation clause. Therefore, unlike NGI's, SVP's do not have a statutory right against self-incrimination. The question of whether this disparate treatment violates equal protection was recently addressed in the case of *People v. Curlee* (2015) 237 Cal.App.4th 709 (*Curlee*).

*Curlee* recognized that a necessary prerequisite to a valid equal protection claim is that the groups being compared must be "similarly situated" with respect to the particular right in question. (*Curlee, supra*, 237 Cal.App.4th at p. 720.) After reviewing *McKee*, which determined SVP's were similarly situated to NGI's with respect to the burden of proof and length of their commitments, the *Curlee* court concluded SVP's were similarly situated to NGI's for purposes of the right against self-incrimination. *Curlee*

13

reasoned, "Both groups have committed a criminal act and have been found to suffer from a mental condition that might present a danger to others. [Citation.] At the end of the SVP's prison term, and at the end of the term for which an NGI could have been imprisoned, each is committed to the state hospital for treatment if, at the end of that period, the district attorney proves in a jury trial beyond a reasonable doubt that the person presents a danger to others as a result of a mental disease, defect, or disorder. [Citations.] The purpose of the commitment is the same: To protect the public from those who have committed criminal acts and have mental disorders and to provide mental health treatment for the disorders. [Citations.]" (*Curlee, supra*, 237 Cal.App.4th at p. 720; see also *In re Moye* (1978) 22 Cal.3d 457 [equating NGI's with people who were subject to commitment under the Mentally Disordered Sex Offender Act, which was the forerunner to the SVPA].)

Next, the *Curlee* court examined whether the disparate treatment between SVP's and NGI's with respect to the right against self-incrimination was justified on the record before it. In so doing, the court noted that in *McKee* the state was able to justify the disparate treatment at issue in that case. It did so by showing "SVP's were more likely [than NGI's] to commit new sexual offenses when released []; victims of sex offenses suffered unique and, in general, greater trauma, than victims of other offenses; and SVP's were less likely to participate in treatment and more likely to be deceptive and manipulative than [NGI's]. [Citation.]" (*Curlee, supra*, 237 Cal.App.4th at p. 721.)

However, as *Curlee* recognized, that showing was made during the course of an evidentiary hearing that occurred on remand from the Supreme Court's ruling in *Mckee*. (See *McKee, supra*, 47 Cal.4th at pp. 1208-1209 [ordering remand] and *People v. Mckee* (2012) 207 Cal.App.4th 1325 (*McKee II*) [appeal from remand hearing].) Because the equal protection issue presented in *Curlee* was different from the one raised in *McKee*, and because the issue in *Curlee* had not been litigated in the trial court, *Curlee* followed *McKee*'s lead and remanded the matter to allow the state the opportunity to

14

demonstrate a constitutional justification for giving NGI's the right against self-incrimination but not SVP's. (*Curlee, supra*, 237 Cal.App.4th at p. 722.)

We invited the parties to submit additional briefing on the *Curlee* decision. As a preliminary matter, the state contends appellant forfeited his right to invoke *Curlee* and challenge his commitment on equal protection grounds because he did not object when the prosecutor called him to testify at trial. However, as the state readily admits, the law allowed SVP's to be compelled to testify at that time. And the right of NGI's not to testify – which is an essential component of appellant's equal protection claim – was not firmly established until just this year. (See *Hudec v. Superior Court, supra*, 60 Cal.4th 815 [resolving a split between *People v. Haynie* (2004) 116 Cal.App.4th 1224 and *People v. Lopez* (2006) 137 Cal.App.4th 1099.) Under these circumstances, we will proceed to address the merits of appellant's equal protection claim. (Accord, *Curlee, supra*, 237 Cal.App.4th at pp. 713-716.)

As for the threshold question of whether SVP's and NGI's are similarly situated, the state contends "schematic differences" underscore why the two groups are not in the same boat when it comes to the right against self-incrimination: "An NGI committee has not only been committed for treatment in the state hospital [since the time of the initial NGI finding], he or she raised and proved his own insanity at the original insanity trial. By contrast, there might be no evidence of mental illness or disorder in an SVP's criminal trial. And, of course, it would be an exceedingly rare event for such an offender . . . to have undertaken a burden at the criminal trial of showing he or she" met the criteria for commitment as a SVP. The consequence of this, according to the state, is that there may not be as much information available about the potential committee's mental condition in SVP proceedings as compared to NGI proceedings.

The state sees this as creating "the practical need for the district attorney to call the opposing party at an SVP trial." However, the same claim was rejected in *Curlee* as being analytically misplaced. We agree with *Curlee* that the state's argument "is more

15

closely connected to the question of whether the [state] has justified the disparate treatment of NGI's and SVP's than to the question of whether they are in fact similarly situated." (*Curlee, supra*, 237 Cal.App.4th at p. 721.) Therefore, we will turn our attention to the justification issue.

Reformulating its previous argument, the state contends there is a rational basis for requiring SVP's to testify at their commitment hearings, given the limited amount of information that may be known about their mental condition. The state contends, "It is wholly plausible that the Legislature could perceive significant differences between incarcerated SVP candidates and hospitalized NGI committees respecting the overall amount of available treatment data and access by the district attorney to sufficient information to meet the burden of proof. And it is no less plausible that the Legislature might seek to rectify or at least minimize such differences by permitting the district attorney to call suspected SVP's."

However, appellant was in a mental hospital for 10 years before his commitment trial began. The parties had plenty of information about his mental condition. The state's argument simply does not fit the facts of this case.

In addition, the state's argument is faulty on another level: it assumes the disparate treatment appellant received need only be rationally related to a legitimate state interest in order to pass constitutional muster. The fact is, because appellant's commitment infringes on his right to be free from involuntary confinement, "the strict scrutiny standard of equal protection analysis applies." (*In re Moye, supra*, 22 Cal.3d at p. 465; accord, *McKee, supra*, 47 Cal.4th at p. 1206; *People v. Landau* (2013) 214 Cal.App.4th 1, 46; *McKee II, supra*, 207 Cal.App.4th at p. 1335.) Under that standard, "the state must establish both that it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest." (*In re Moye, supra*, 22 Cal.3d at p. 465.) Suffice it to say, the state has *not yet* satisfied this heightened standard of constitutional review in this case.

16

Nonetheless, the state urges us to affirm the judgment for lack of prejudice. Relying on the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, the state asserts it is not reasonably probable appellant would have obtained a more favorable result without his compelled testimony. In *Curlee*, the court did appear to apply the *Watson* standard in assessing prejudice in that case. (*Curlee, supra*, 237 Cal.App.4th at p. 722.) However, even under that deferential standard it found the admission of the SVP's testimony to be prejudicial. (*Ibid.*) Moreover, in so doing, *Curlee* relied on *Cramer v. Tyars* (1979) 23 Cal.3d 131, 139, which applied the harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 to the alleged Fifth Amendment violation that occurred in that case. We believe this more stringent standard applies here given the significant liberty interest at stake for appellant.

Under that standard, appellant was clearly prejudiced by virtue of having to take the witness stand. The state contends appellant's testimony was merely cumulative of what the experts testified to, but unlike the experts, who focused on the clinical aspects of the case, appellant spoke to more personal issues, such as the nature of his relationship with the victims and what motivated him to abuse them. At the very least, appellant's lengthy appearance on the witness stand[6] was significant in that it gave the jury an opportunity to observe him in person as he attempted to respond to the allegations against him. The powerful impressions he presumably created in the process of doing so cannot be lightly dismissed as "harmless."

Lastly, the state urges us to take a wait-and-see approach to the equal protection issue. Rather than ordering a hearing on the issue, the state asserts it would be better if we awaited the outcome of the evidentiary hearing in *Curlee* to see if the petitioner can prevail in that case. And if he does, appellant can then file a habeas

---

[6] Appellant's testimony spans over 100 pages of the reporter's transcript.

petition seeking relief.  That approach would save resources in the short run, but there is no guarantee that the hearing ordered in *Curlee* will take place or that it will culminate in a published appellate opinion having widespread precedential effect.  More fundamentally, we do not believe the resolution of appellant's case should have to await the outcome of another case over which he has no control.  Therefore, we decline the state's invitation to put the matter on hold.

## DISPOSITION

The matter is remanded for an evidentiary hearing to allow the state the opportunity to justify the differential treatment SVP's receive under the law when it comes to the right against self-incrimination.  In conducting the hearing, the trial court shall apply the standards and rules articulated by the Supreme Court in *Mckee*.  If the state can provide a constitutional justification for treating SVP's differently from NGI's, the trial court shall affirm appellant's commitment order.  If the state cannot carry its burden in that regard, the trial court shall conduct a new hearing at which appellant would not be required to testify.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.


18